ATLANTIC MONTHLY COMPANY,
Plaintiff,

v.

FREDERICK UNGAR PUBLISHING
CO., Inc., Defendant.

United States District Court
S. D. New York.
July 26, 1961.

See also 185 F.Supp. 221.

Weil, Gotshal & Manges, New York City, Horace S. Manges, Jacob F. Raskin, Marshall C. Berger, New York City, of counsel, for plaintiff.

Alfred A. Rosen, New York City, for defendant.

WEINFELD, District Judge.

The plaintiff is the publisher of the magazine "The Atlantic Monthly," also known as "The Atlantic." It also publishes books, alone or in cooperation with co-publishers, under the imprint "Atlantic Monthly Press." It brings this action to enjoin the defendant from designating paperback books published by it as "Atlantic Paperbacks," and from using or simulating the names "The Atlantic," "The Atlantic Monthly" and "The Atlantic Monthly Press." Plaintiff predicates its right to relief upon two claims: (1) trade-mark infringement under the Lanham Act.[1] and (2) unfair competition.[2] The principles of law governing these claims are essentially the same.[3]

1. 15 U.S.C.A. § 1114.

2. 28 U.S.C.A. § 1338(b).

3. Avon Shoe Co. v. David Crystal, Inc., 2 Cir., 279 F.2d 607, 614, certiorari denied 1960, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed. 2d 224.

As is not unusual, the evidence tendered in support of each is substantially the same.

The Atlantic Monthly is a magazine of recognized superiority, devoted to literature, art, science and politics. Its contents include articles, essays, poems and stories. The first number of the magazine was issued in November 1857, and it has been published monthly ever since. Its founders include Henry Wadsworth Longfellow, Oliver Wendell Holmes,[4] James Russell Lowell, and other distinguished names in American literature. Lowell was the first editor; subsequent editors include other eminent figures in American letters—William Dean Howells, Thomas Bailey Aldrich, Walter Hines Page and Bliss Perry. The plaintiff has been the publisher of the magazine for more than half a century, having acquired it and its good will in 1908 from the Houghton, Mifflin & Company, its then publisher.

In June 1921, plaintiff registered the trade-mark "Atlantic Monthly" in the United States Patent Office and the registration was renewed in June 1941. The renewal states that the trade-mark had been used continuously by plaintiff and its predecessors since 1857.

From its earliest days the magazine was referred to by its publishers and editors as the "Atlantic." The very first issue contains such references in the definition of its policies. Interspersed among the many communications and comments of the founders, publishers and staff members are repeated references to the magazine as the "Atlantic."[5] In due time it became popularly known as "The Atlantic" and was so referred to interchangeably with "The Atlantic Monthly." After many years of such acceptance, commencing with the July 1932 issue, the word "Monthly" was dropped from the title on the front cover and ever since only "The Atlantic" has appeared on the front of each issue. Each issue is interlarded with references to "The Atlantic" or "Atlantic." These include, for example, such items as "The Atlantic Report," "Atlantic Announces," "The Atlantic Serial," "Atlantic Repartee," "The Atlantic Bookshelf," and "Atlantic Monthly Press Books." The hundredth anniversary number, November 1957, is captioned on the front cover, "The Atlantic 100th Anniversary Issue," and on the inside cover, "November Atlantic, The Centennial Issue."

Paid advertisements appearing in the magazine designate it as the "Atlantic." National awards for outstanding achievements have been made to it in the name "The Atlantic" by public-interest groups.

Notwithstanding contraction in 1932 of the front cover title to "The Atlantic," the magazine retains on the spine and as the running heads of the pages the registered trade-mark "Atlantic Monthly" or "The Atlantic Monthly"—a point of which defendant makes much, as we shall soon see.

Since 1925, the magazine has conducted a novel contest every alternate year, and a nonfiction contest in the intervening year. Substantial money prizes are awarded to the winner and many manuscripts are submitted in the competition. Upon publication, the prize-winning book has on its dust jacket "The Atlantic Prize Novel" or "The Atlantic Nonfiction Award," as the case may be. These books are extensively advertised in similar fashion in plaintiff's magazine, other magazines, and newspapers.

"Atlantic" is the key word in plaintiff's promotion campaigns for new subscribers and for advertisers. From 1927 through 1960 plaintiff expended more than six million dollars in advertising the magazine. In 1960 its annual advertising expenditure was almost $300,000, and the annual average from 1950 on was more than $250,000.

---

4. Interestingly, the father of the great justice named the magazine and even foresaw that it would be called the "Atlantic." M. A. DeWolfe Howe, The Atlantic Monthly and Its Makers, 18–19 (1919). (Plaintiff's Exhibit 2.)

5. M. A. DeWolfe Howe, The Atlantic Monthly and Its Makers (1919).

The magazine's circulation for the past year exceeded 270,000 per monthly issue, and its readers are to be found in the fifty states of the Union and many foreign countries. Almost $900,000 was realized from the sale of advertising space in the magazine for the year 1960.

Plaintiff's activities in the book field fall into distinct periods. Prior to 1917, it or its predecessors published books entitled "Atlantic Classics," "Atlantic Readings" and "The Atlantic Almanac."[6] In 1917 plaintiff organized a wholly-owned subsidiary, The Atlantic Monthly Press, Inc. From that date to 1925, it published through its subsidiary 130 books, mostly so-called hardbacks. All these books contained the imprint "The Atlantic Monthly Press" on the title page, on the spine of the book, where possible, and on the dust jacket, if any.

In 1925, plaintiff and its subsidiary, The Atlantic Monthly Press, Inc., entered into an agreement with Little, Brown and Company for the reprint of books previously issued by the plaintiff and for the publication of new books. As to the latter, plaintiff's function was to locate authors, secure manuscripts, exercise editorial judgment with respect thereto, edit and prepare them for publication; Little, Brown's role was to manufacture, advertise and market the books. In short, the editorial judgment was plaintiff's and the production, marketing and distribution that of Little, Brown, but each had the right to veto any proposed publication. Under this cooperative venture, more than 300 books were published from 1925 through 1941. The title page of each, in accordance with their agreement, bears the imprint "An Atlantic Monthly Press Publication" or the Atlantic Monthly Press colophon, and the copyright page, "The Atlantic Monthly Press Publications are published by Little, Brown and Company in association with The Atlantic Monthly Company."

In 1941 Atlantic Monthly Press, Inc., was dissolved and merged into the parent company,[7] the plaintiff herein, as its Book Division. Thereupon another agreement was entered into by plaintiff with Little, Brown and Company, which in substance provides for a continuation of their prior arrangement. Under the amended contract more than 400 books were published by December 31, 1960. These books have a substantially similar imprint[8] on the title and copyright pages as those published under the original agreement; in addition, the spine of the cover and of the dust jacket contain the words "Atlantic-Little, Brown." Full page advertisements listing groups of these books are headed "Atlantic Novels."

Of the more than 700 books published from 1925 through 1960 under agreements with Little, Brown and Company, almost six million copies (exclusive of book club sales) were sold, and the advertising expenditure for these new books was almost $1,500,000. From 1947 through 1959, eight and a half million copies were sold through book clubs.

Plaintiff also had agreements with D. C. Heath for the publication of hardcover text books. These contain on the title page, "An Atlantic Monthly Press Book, D. C. Heath and Company," and on the copyright page, "Atlantic-D. C. Heath Books are published by D. C. Heath and Company in association with The Atlantic Monthly Press."

From time to time, plaintiff has published paperbound and paperback books, although it has not recently and does not presently publish a series of paperbacks.[9]

---

6. The first was a hardback series and the last two, paperbound.

7. Although from 1925 to the dissolution of its subsidiary in 1941 publication of books was carried on principally through its subsidiary, during this period plaintiff also published books.

8. Under the amended agreement, the imprint on the title page is "An Atlantic Monthly Press Book," and on the copyright page, "Atlantic-Little, Brown Books are published by Little, Brown and Company in association with the Atlantic Monthly Press."

9. Those that were published had such titles as "Atlantic Readings," "The Atlantic Almanac," "The Atlantic Contests for College Students," and "The Atlantic

In 1945 plaintiff entered into an agreement with Pocket Books, Inc., a publisher of paperback books, under which "The Pocket Atlantic" was issued, edited by the editor-in-chief of plaintiff's magazine and containing outstanding stories and articles previously published in the magazine. The back cover referred to it as "An Atlantic Sampler." Almost 125,000 copies were sold.

The defendant has been a book publisher since 1945, and up to 1960, had published only hardcover books. In 1960, the defendant, under a license agreement entered into in 1959 with Little, Brown and Company, reprinted a hardcover Atlantic Monthly Press book.

In March 1960, the defendant announced in "Publishers' Weekly" that it planned publication of a paperback series under the name of "Atlantic Paperbacks." Plaintiff's attorneys forthwith advised the defendant of plaintiff's claim to the use of "Atlantic" in connection with its publications and urged the defendant to desist from its contemplated use of "Atlantic Paperbacks," but the defendant disputed plaintiff's claimed right, asserting "there is very little likelihood of any confusion between our Atlantic Paperbacks and The Atlantic Monthly," and proceeded with its planned publication. The defendant issued its first book in April 1960, and to the date of trial has published approximately twenty-five paperbacks, principally reprints in the fields of European literature, philosophy, religion and history. The front covers of all these books bear the imprint "Atlantic Paperbacks." The spines contain the same imprint, except that in a number of instances, the word "Paperback" is omitted, so that only "Atlantic" appears. The title pages identify the defendant as the publisher.

The defendant challenges the plaintiff's claim to relief upon a number of grounds. As to the claim of trademark infringement, it points out that the registration was of the combined words "Atlantic Monthly" and not of "The Atlantic," and it emphasizes that after the front cover of the magazine was changed to "The Atlantic" in 1932, subsequent issues have retained the imprint "Atlantic Monthly" on the spine and as the running heads of pages; consequently, it argues that the plaintiff still holds the magazine out to its readers by the registered mark. Defendant further contends that the magazine continues to be known, and is commonly referred to by the public, as the "Atlantic Monthly." In summary, it concludes that there is no infringement of the mark as registered, and since the strength of the mark is not "Atlantic," but only the combined words "Atlantic Monthly," the shortened name has no trade-mark significance and thus there is no basis for an infringement claim. Insofar as the argument attaches importance to the fact of registration, it is not well founded; registration neither creates a trade-mark nor is essential to its validity.[10] The basic question is whether a magazine or book bearing the imprint "Atlantic" identifies plaintiff as its source in the public mind.[11] If so, the fact that the mark is not registered does not diminish plaintiff's common-law right to protection.[12]

Contests for High School and Private School Students." The latter two have been published each year without interruption since 1925.

10. See Neely v. Boland Mfg. Co., 8 Cir., 1960, 274 F.2d 195, 202; Brown & Bigelow v. B·B Pen Co., 8 Cir., 1951, 191 F. 2d 939, certiorari denied 1952, 343 U.S. 920, 72 S.Ct. 678, 96 L.Ed. 1333; E. F. Prichard Co. v. Consumers Brewing Co., 6 Cir., 1943, 136 F.2d 512, 518, certiorari denied 1944, 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060; Industrial Rayon Corp. v. Dutchess Underwear Corp., 2 Cir., 1937, 92 F.2d 33, 35, certiorari denied 1938, 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100.

11. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195; Elgin National Watch Co. v. Illinois Watch-Case Co., 1901, 179 U.S. 665, 673, 21 S.Ct. 270, 45 L.Ed. 365; Restatement, Torts § 716, comment b (1938).

12. See cases cited at note 10 supra.

■ Neither does the fact that "Atlantic" is a geographic term foreclose relief in a proper case. It is true, as the defendant next urges, that a geographic term, descriptive of a locality or the origin of a product, does not qualify as a valid common-law trade-mark.[13] But this rule is subject to an exception where, as in the instant case, the geographic term is used arbitrarily and not to describe the origin of the magazine, the magazine itself or its contents. In such circumstance, the term qualifies as a technical trade-mark and in a proper case relief may be granted to the prior user on the ground of infringement.[14] Moreover, while it is also true that even when a geographic term, descriptive of a product, has acquired a secondary meaning, it does not qualify as a trade-mark at common law, the law affords protection to the prior user, not on the ground of infringement, but on that of unfair competition.[15] Whatever route one travels, whether by trade-mark infringement, or unfair competition, the signs give direction to the same inquiry—whether the use of "Atlantic Paperbacks" is likely to cause confusion or to deceive purchasers that plaintiff is the source of such books. The basic test of both claims is the same.[16]

Accordingly, our initial inquiry is whether a secondary meaning has attached to "Atlantic" when used in relation to publications.

■ The evidence is overwhelming that for years, indeed decades, the plaintiff's magazine has been designated, advertised and distributed as both "The Atlantic Monthly" and "The Atlantic"; that it has been so referred to interchangeably by readers, publishers, editors, advertisers and book reviewers. "Atlantic" has become the key or operative word of the registered trade-mark and has itself achieved a secondary mean-

13. Elgin National Watch Co. v. Illinois Watch-Case Co., 1901, 179 U.S. 665, 677, 21 S.Ct. 270, 45 L.Ed. 365; California Apparel Creators v. Wieder of California, Inc., 2 Cir., 162 F.2d 893, 897, 174 A.L.R. 481, certiorari denied 1947, 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393; Charles Broadway Rouss, Inc. v. Winchester Co., 2 Cir., 300 F. 706, certiorari denied 1924, 266 U.S. 607, 45 S.Ct. 92, 69 L.Ed. 465.

14. Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 1916, 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629 (The American Girl Shoe); LaTouraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115, 116–117, certiorari denied 1946, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663; McIlhenny Co. v. Gaidry, 5 Cir., 1918, 253 F. 613, 621 (Tabasco sauce); Wertheimer v. Batcheller Importing Co., C.C.S.D.N.Y.1911, 185 F. 850 (semble); Dennison Mfg. Co. v. Thomas Mfg. Co., C.C.D.Del.1899, 94 F. 651, 653 (American Express sealing wax); Fleischmann v. Schuckmann, N.Y. Sup.Ct.1881, 62 How.Pr. 92 (Vienna bread); Restatement, Torts § 720, comment d (1938). See Phenix Cheese Co. v. Kirp, 1st Dep't 1917, 176 App.Div. 735, 164 N.Y.S. 71; Julius Kayser & Co. v. Italian Silk Underwear Co., 1st Dep't 1914, 160 App.Div. 607, 614–618, 146 N. Y.S. 22, 28–30. Cf. Walter Baker & Co. v. Baker, C.C.W.D.Va.1896, 77 F. 181, 188–189.

15. Elgin National Watch Co. v. Illinois Watch-Case Co., 1901, 179 U.S. 665, 674, 21 S.Ct. 270, 45 L.Ed. 365; Charles Broadway Rouss, Inc. v. Winchester Co., 2 Cir., 300 F. 706, certiorari denied 1924, 266 U.S. 607, 45 S.Ct. 92, 69 L.Ed. 465. See French Republic v. Saratoga Vichy Spring Co., 1903, 191 U.S. 427, 435, 24 S. Ct. 145, 48 L.Ed. 247; Eastern Const. Co. v. Eastern Engineering Corp., 1927, 246 N.Y. 459, 463, 159 N.E. 397, 398; Restatement, Torts §§ 740, 744, comment d (1938). Cf. Speed Products Co. v. Tinnerman Products, Inc., 2 Cir., 1949, 179 F.2d 778, 781; Little Tavern Shops, Inc. v. Davis, 4 Cir., 1941, 116 F.2d 903, 905–906.

16. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 325, 59 S.Ct. 191, 83 L.Ed. 195; American Steel Foundries v. Robertson, 1926, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317; Avon Shoe Co. v. David Crystal, Inc., 2 Cir., 279 F.2d 607, 614, certiorari denied 1960, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed. 2d 224; Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 1952, 199 F.2d 602, certiorari denied 1953, 345 U.S. 909, 73 S. Ct. 650, 97 L.Ed. 1345; G. B. Kent & Sons v. P. Lorillard Co., D.C.S.D.N.Y. 1953, 114 F.Supp. 621, affirmed on opinion below, 2 Cir., 1954, 210 F.2d 953.

ing.[17] Moreover, since "Atlantic" is used arbitrarily and not in a true geographic sense, it also qualifies as a technical trade-mark. The proof compels the conclusion that when used with reference to a magazine, "Atlantic" at once signifies the publication of the plaintiff; that such identification, however, is not limited to magazines, but also extends to books.[18] A book, whether referred to as an "Atlantic," "Atlantic Press," "Atlantic Monthly Press" or "Atlantic-Little, Brown" book, is at once identified as a publication emanating from the plaintiff, one co-published by it or in which it has played a significant role. "Atlantic," whether applied to a magazine or a book, is recognized as the plaintiff's hallmark by the reading public, the publishing world and the book industry. Its secondary meaning has been firmly embedded in the public mind in the more than 100 years of use and recognition.[19]

■ Plaintiff is thus entitled to protection of the word "Atlantic," whether used alone or in conjunction with other words by which plaintiff's publications are known to the public.

■■ The defendant next urges that, in any event, there is no likelihood of confusion between books published by it under "Atlantic Paperbacks" and those published or sponsored by plaintiff which bear the imprint "Atlantic Monthly Press" or a related designation. The essential inquiry here is whether an appreciable number of ordinarily prudent, prospective purchasers are likely to be confused or misled into believing that plaintiff is the source of "Atlantic Paper-

backs."[20] The issue is one of fact as to the probable or actual reactions of such purchasers.

First, there is not only similarity of names, but substantial identity of products. Books, whether hardback or paperback, are in direct competition; they are distributed and sold through the same outlets at the wholesale and retail levels and the market in each instance is nationwide.[21]

Next, three witnesses, the founder of the nation's largest book club, acknowledged by the defendant as "highly qualified to talk about publications of all kinds," [22] a distinguished professor of literature, and the executive of a well-known retail book distributor, testified that "Atlantic" or "Atlantic Paperbacks" appearing on the spine or cover of a paperback book suggests to them, experienced as they are, and even more readily would lead the general public to believe, that the publisher or sponsor of such books was "The Atlantic" or "The Atlantic Monthly," and ·that the books enjoyed the endorsement of its editors. One of the defendant's own witnesses conceded there was a chance of such confusion, but discounted its likelihood.

In addition, instances of actual confusion were satisfactorily established. A college professor wrote to Little, Brown with reference to Atlantic paperbacks, in the belief they were publications sponsored in the usual manner under the cooperative arrangement. The letter was addressed, "Little, Brown and Company —Atlantic Paperbacks Division," and, in addition to noting that an order had been placed for a particular "Atlantic Paper-

17. See Photoplay Pub. Co. v. La Verne Pub. Co., 3 Cir., 1921, 269 F. 730, 733.

18. Compare Gannert v. Rupert, 2 Cir., 1904, 127 F. 962.

19. See British-American Tobacco Co. v. British-American Cigar Stores Co., 2 Cir., 1914, 211 F. 933. Compare Jewel Tea Co. v. Kraus, D.C.N.D.Ill., 88 F. Supp. 1003, modified, 7 Cir., 1950, 187 F. 2d 278, with Sun Valley Mfg. Co. v. Sun Valley Togs, Inc., D.C.S.D.N.Y.1941, 39 F.Supp. 502.

20. Avon Shoe Co. v. David Crystal, Inc., 2 Cir., 279 F.2d 607, 612, certiorari denied 1960, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224; Maternally Yours, Inc. v. Your Maternity Shop, Inc., 2 Cir., 1956, 234 F.2d 538, 542; Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 1952, 199 F.2d 602, certiorari denied 1953, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345.

21. Cf. Admiral Corp. v. Penco, Inc., 2 Cir., 1953, 203 F.2d 517, 520–521.

22. Defendant's memorandum after trial, p. 3.

back," the writer requested an examination copy for use in his course. In another instance, a college placed an order with Little, Brown for an "Atlantic Paperback."

Finally, on the issue of likelihood of confusion, we consider whether defendant's adoption of the name "Atlantic Paperbacks" was innocent or purposeful, for "evidence of defendant's bad faith and of an intent to palm off its product as that of the plaintiff, or to trade on the latter's good will may be strong evidence of the likelihood of confusion." [23] The defendant attributed origin of the name to defendant's association with one Robert Grossbard, who had, in 1944, filed in New York County a certificate of doing business under the trade name Atlantic Publishing Company. The defendant's principal stockholder and chief executive officer testified that he had entered into an oral profit-sharing arrangement with Grossbard in 1944, under which the latter used the defendant's facilities for the production and distribution of Atlantic Publishing Company books. The explanation by defendant of the selection of "Atlantic Paperbacks" is that sixteen years later, in 1960, when it decided to issue a paperback series, a secretary in the defendant's employ proposed the name because of the alleged association with Grossbard's Atlantic Publishing Company, and that the "Atlantic" Ocean was suggestive of the nature of the books the defendant planned to publish in the fields of European history, literature and philosophy. Although the proposed use of the name allegedly was discussed with Grossbard, a friend and business associate of the defendant's president, he was not called as a witness.

Grossbard's publishing activities were indeed insignificant. The trade name had no telephone listing; it was obscure and unknown to the industry and to the public, and the plaintiff never heard the name until April 1960, when defendant advanced it in response to plaintiff's demand to desist from using the name "Atlantic Paperbacks." Grossbard published a limited number of foreign language books, the last of which was issued in 1946, from which time his business was nonexistent except for the distribution of a small inventory as to which orders came trickling in.

Upon all the evidence, I am of the view that the defendant's explanation as to the origin of "Atlantic Paperbacks" is sham and that it is a built-in defense conceived in anticipation of the charges now leveled against it. After observing the demeanor of the witnesses who testified on this subject, I am satisfied that "Atlantic Paperbacks" was artfully adopted—not innocently, but wilfully and deliberately to capitalize on plaintiff's reputation—to create the impression that defendant's books were the plaintiff's product.

Defendant's purposeful course of conduct clearly emerges from the entire record and is emphasized by demeanor evidence. It had actual knowledge that plaintiff's books were published under the imprint of Atlantic Monthly Press. At or about the very time it employed the name "Atlantic Paperbacks," defendant had, under its agreement with Little, Brown and Company, reprinted one of the plaintiff's books with the following legend: "Reprinted 1960 by arrangement with Little, Brown and Company by whom the work was originally published in association with Atlantic Monthly Press." And certainly, as a publisher for more than fifteen years, defendant was not unaware of plaintiff's prestige and the value of the name "Atlantic" in the publishing world. Defendant's intent to reap the benefit of plaintiff's standing with the public is emphasized by the testimony of its president that the particular name under which a paperback series is issued is of no importance —that a series name is simply a con-

23. G. B. Kent & Sons v. P. Lorillard Co., D.C.S.D.N.Y.1953, 114 F.Supp. 621, 626, affirmed on opinion below 2 Cir., 1954, 210 F.2d 953. See Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 2 Cir., 1960, 281 F.2d 755, 758; Restatement, Torts § 729, comment f (1938).

venient means of placing orders for books and to facilitate handling, and that one name is just as good as any other for that purpose. Thus, with a limitless selection of names suitable to market its product and with every reason to "keep far enough away to avoid all possible confusion," [24] the defendant did exactly the reverse. In this circumstance, the proffered explanation exposes itself, not only as a preconceived defense, but reflects a consciousness of purpose to engage in unfair competitive activity. As has been said:

> "It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." [25]

The conclusion is compelled that the defendant's adoption of "Atlantic Paperbacks" was not made in good faith; its calculated purpose was to trade on the reputation and good will of a distinguished publishing concern, which had been built up over a century based upon high editorial standards.

The defendant seeks to attenuate the likelihood of confusion by stressing that the title page of the "Atlantic Paperback" series contains only the defendant's name as publisher, and so urges that the average person will not be misled into believing that the book originated with plaintiff, even though the cover and the spine bear the imprint "Atlantic Paperbacks." [26] In view of the cooperative arrangement in which plaintiff participates with other publishers—an arrangement clearly delineated in all such publications—the use of "Atlantic Paperbacks," or, as in some instances, "Atlantic" on the spine and outside cover of defendant's books, suggests that plaintiff has edited and sponsored the book in cooperation with the defendant, which, in and of itself, is misleading.[27]

As to instances which defendant advances of others using "Atlantic," no more need be said than that they were as obscure and unknown as the Grossbard trade name, or in some cases as irrelevant.

The evidence abundantly supports a finding that defendant's use of "Atlantic" or "Atlantic Paperbacks" on books is likely to cause confusion or to deceive purchasers that plaintiff is the source, copublisher or sponsor of such books.

The fact that up to the present plaintiff's books have been principally of the hardcover type does not prevent it from obtaining redress. A book, whether a paperback, papercover or hardback, is a product of the book-publishing business, in which both the plaintiff and defendant are engaged. In the light of current conditions, paperbacks are in competition with hardbacks; in fact, there are those who think too much so.

The Court takes judicial notice that a great change has been effected in the book-publishing industry. Paperback books are a phenomenon on the American scene and have revolutionized the industry; they now represent a significant portion of the yearly output of reprints and originals. Printed and issued under mass production concepts, they have,

24. G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 265 F.2d 385, 387, certiorari denied 1959, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65. See Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 2 Cir., 1960, 281 F.2d 755, 758.

25. Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 1910, 178 F. 73, 75. See Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir.,

1952, 199 F.2d 602, 603, certiorari denied 1953, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345.

26. For the rejection of a similar contention, see Little Tavern Shops, Inc. v. Davis, 4 Cir., 1941, 116 F.2d 903, 906.

27. Ibid. See Menendez v. Holt, 1888, 128 U.S. 514, 521, 9 S.Ct. 143, 32 L.Ed. 526.

compared to traditional hardbacks, been inexpensively priced, and soon after their introduction gained popular acceptance and attracted a vast reading audience. Hailed by some in the industry as a boon, and damned by others as a curse, in due time paperbacks also won favor with librarians, literary critics and book sellers, and finally were accepted, even if somewhat grudgingly, by old-line publishers. Paperbacks represent a cold, hard economic fact in the publishing business that will not down. One after another of the leading hardback publishers have fallen in line and broadened their operations to include paperbacks.[28] A number have used their highly respected trade-marks or trade names on such books.[29] Whether plaintiff will join the ranks is a matter for its decision, but the popularity of paperbacks in an expanding consumer market makes it more than likely that eventually all publishers, in order to meet the competitive challenge, will include paperbacks in their annual output.[30] Indeed, plaintiff is already committed to an expansion program to include the publishing of paperbacks, and, for the past two years, has been engaged in a study to determine what form the program should take.

 Moreover, assuming arguendo, that paperbacks are not in direct competitive conflict with hardbacks, it cannot be gainsaid they are in the same field. In such a circumstance, where one is being "driven to add other 'lines' in order to hold or develop [its] existing market," [31] it is entitled to protect its identity in the ancillary market.

 Other factors press for consideration. Plaintiff is entitled to protection of its reputation against tarnishment.[32] Plaintiff's imprimatur upon a publication denotes to a reader a discriminating editorial judgment of the quality of the work. While up to the present, the defendant has published books in the fields of European literature, philosophy and religion, there is nothing to prevent it from issuing what the book-publishing industry refers to as "trash" or "cheap pulp" material, which, if put out under the name "Atlantic Paperbacks," would be attributed to plaintiff as the source or sponsor.[33] Such a development would tarnish and greatly diminish plaintiff's long-standing reputation for sound and selective editorial judgment and seriously impair its good will.[34] This is not entirely a matter of conjecture. It is noted

---

28. Walters, "There's Something For Everybody," N. Y. Times, Jan. 17, 1960, § 7, Part II (Book Review Paperback Book Section), pp. 1, 32. Transcript of trial, p. 104.

29. Others have adopted a mark or name for the paperback series different from that used on hardbacks.

30. "Newcomer," N. Y. Times, July 2, 1961, p. 8, col. 1 (Book Review).

31. S. C. Johnson & Son v. Johnson, 2 Cir., 1940, 116 F.2d 427, 429. See Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 1917, 247 F. 407, certiorari denied 1918, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540.

32. See Yale Electric Corp. v. Robertson, 2 Cir., 1928, 26 F.2d 972; Wall v. Rolls-Royce of America, Inc., 3 Cir., 1925, 4 F.2d 333; Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 1917, 247 F. 407, certiorari denied, 1918, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540. Cf. Avon Shoe Co. v. David Crystal, Inc., 2 Cir., 279 F.

2d 607, 613, certiorari denied, 1960, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224.

33. The industry apparently recognizes two different types of paperbacks, one appealing to the mass market which has been equated with popular magazines and allegedly competes with them, and the other, so-called quality papers, priced much higher and allegedly in competition with standard works in hardbacks. Thus, the distinction appears to be as sharp as that between a magazine of high literary quality and one which draws from the mass audience. Cowley, "The Paperback Title Fight," The Reporter Magazine, July 7, 1960, p. 44.

34. See Avon Shoe Co. v. David Crystal, Inc., 2 Cir., 279 F.2d 607, 613, certiorari denied 1960, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224; Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 1917, 247 F. 407, certiorari denied 1918, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540; Restatement, Torts § 730, comment a (1938). Cf. Yale Electric Corp. v. Robertson, 2 Cir.,

that the defendant has not been altogether precise in its standard of business conduct. In a paperback magazine advertisement which purported to list thirty "Atlantic Paperbacks," eighteen books were improperly included, each of which defendant's president termed "an error."

While it may be acknowledged, as the defendant urges, that a prospective buyer of a book is primarily interested in author, subject and title, nonetheless a prestige publisher's name appearing thereon is a significant factor with a percentage of prospective buyers [35]—as much was conceded by a defense witness, although its relative importance was minimized. But apart from the impact upon the ultimate reader, a highly esteemed publisher is of particular significance to retail book sellers who obtain the advantage of promotional advertising in association with such a publisher.

■■■ The defendant's further argument that Little, Brown and Company, and not the plaintiff, is the publisher of Atlantic Monthly Press Books, disregards their specific agreement—one which was last renewed for fifty years. It also ignores the fact that the right to protect one's trade-mark or a name that has acquired a secondary meaning is not dependent upon the owner himself manufacturing or selling the product upon which he places his trade-mark or trade name. Plaintiff's agreement with Little, Brown and Company, permitting the controlled use of its trade-mark and trade name in connection with certain books, does not deprive plaintiff of its right to protection against unfair competition and trade-mark infringement.[36]

■■■ The essence of the law of unfair competition [37] is fair play—fair play to the consumer and to one's competitor. Competition may be vigorous, but not deceptive.[38] Our own Court of Appeals recently gave strong support to the enforcement of "increasingly higher standards of fairness or commercial morality in trade," [39] when it ruled that intent to trade on another's reputation and name brings its own condemnation, even absent proof of secondary meaning.[40] In the instant case the conduct engaged in is even more flagrant.

The plaintiff is entitled to an appropriate decree as prayed for enjoining the defendant from using the name "Atlantic" in its paperback series or any other books published by it, or in any wise simulating the names "The Atlantic," "Atlantic Monthly" or "Atlantic Monthly Press."

1928, 26 F.2d 972, 974; Wall v. Rolls-Royce of America, Inc., 3 Cir., 1925, 4 F.2d 333; Stork Restaurant v. Marcus, D.C.E.D.Pa.1941, 36 F.Supp. 90.

35. Thus, if two books on the same subject, bearing the name of unknown authors, were on a bookshelf, and one was published by a well-recognized concern and the other by an unknown publisher, the prospective book buyer would favor the former, since the publisher's name would imply the editorial judgment and sponsorship of its editors.

36. McLean v. Fleming, 1877, 96 U.S. 245, 253, 24 L.Ed. 828; E. F. Prichard Co. v. Consumers Brewing Co., 6 Cir., 1943, 136 F.2d 512, 519, certiorari denied 1944, 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060; Charles Broadway Rouss, Inc. v. Winchester Co., 2 Cir., 300 F. 706, 722–723, certiorari denied 1924, 266 U.S. 607, 45 S.Ct. 92, 69 L.Ed. 465; Keebler Weyl Baking Co. v. J. S. Ivins' Son, Inc., D.C.E.D.Pa.1934, 7 F.Supp. 211.

37. The law of trade-marks and trade-mark infringement is but part of the law of unfair competition. Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713; Brown & Bigelow v. B•B Pen Co., 8 Cir., 1951, 191 F.2d 939, 942, certiorari denied 1952, 343 U.S. 920, 72 S.Ct. 678, 96 L.Ed. 1333.

38. See Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 2 Cir., 1960, 281 F. 2d 755, 758; Norwich Pharmacal Co. v. Sterling Drug, Inc., 2 Cir., 1959, 271 F. 2d 569, 570–571, certiorari denied 1960, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739.

39. Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144, 145, certiorari denied 1953, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377.

40. Lincoln Restaurant Corp. v. Wolfies Rest., Inc., 2 Cir.1961, 291 F.2d 302

The foregoing shall constitute the Court's findings of fact and conclusions of law.

Submit decree in accordance with the foregoing.