Larry MARSHAK, Plaintiff,

v.

Doc GREEN, John Doe "1", John Doe "2", Bernard Jones, David Rick and Sandy Wolfe, Defendants.

79 Civ. 3458.

United States District Court,
S. D. New York.

Jan. 26, 1981.

Marcus & Marcus, New York City, for plaintiff; Clark A. Marcus, New York City, of counsel.

Hopgood, Calimafde, Kalil, Blaustein & Lieberman, New York City, trial counsel for plaintiff; Stephen B. Judlowe, New York City, of counsel.

Walter Hofer, New York City, for defendants Doc Green and David Rick; Jeffrey L. Ringler, White Plains, of counsel.

Paul B. Morofsky, New York City, trial counsel for defendants Doc Green and David Rick.

## OPINION

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

The defendant Doc Green, together with Charles Thomas and Elsbeary Hobbs (not named as defendants), filed on December 17, 1976 in the United States Patent and Trademark Office a service-mark application in the name of "The Drifters," a partnership composed of all three. The Drifters, as the aforesaid applicants, assigned to plaintiff Larry Marshak all their right, title and interest in the pending application. The registration was issued by the Patent Office on January 3, 1978 and covers the mark "THE DRIFTERS" used for "ENTERTAINMENT SERVICES—NAMELY A SINGING GROUP." Marshak has been the manager of The Drifters musical group which included defendant Green since 1971.

In July 1979, Marshak commenced this action against Doc Green and David Rick, the manager of a singing group formed shortly before and using the name The Drifters. Plaintiff charges that such use by the defendants constituted an infringement of the registered service mark,[1] unfair competition,[2] and dilution of the mark.[3] He seeks injunctive relief against defendants' continued use of the mark to represent their services and in the promotion thereof, as well as damages and an accounting of defendants' profits. Defendants, in addition to contending that the assignment of the registration application on which plaintiff bases his ownership is invalid and that plaintiff does not have a right to the exclusive use of the mark, seek cancellation of the registration. Further, they counterclaim for an accounting of monies allegedly owed defendant Green by plaintiff from the time Green performed for plaintiff as a Drifter.

After a thorough review of the trial testimony, including the transcript of the hearing on a preliminary injunction, exhibits and an evaluation of the credibility of witnesses, the Court finds that the plaintiff has sustained his burden of proof as to his respective claims and is entitled to relief; likewise, the defendants have failed to meet their burden on the counterclaims, which are dismissed.

### Events Prior to 1970

A group known as "The Drifters" originally achieved prominence in the late 1950s and early 1960s. Green, Hobbs and Thomas were part of The Drifters when the group was most successful at the end of the 1950s and early 1960s and they recorded popular hit songs such as "There Goes My Baby" and "Save The Last Dance For Me." During this period they were under the management of George Treadwell. In addition to Thomas, Hobbs and Green, who were publicly recognized as part of The Drifters,

---

1. 15 U.S.C. § 1114(1). Plaintiff also alleges infringement at common law and under New York statutes. N.Y.Gen.Bus.Law., Art. 24 (McKinney's 1968).

2. 15 U.S.C. § 1125(a).

3. N.Y.Gen.Bus.Law, § 368–d (McKinney's 1968).

there were others who at times played with the group. Although the membership of the group was not constant, the evidence establishes that Thomas, Hobbs and Green recorded on all or most of The Drifters' hit records, and their pictures appeared on the covers of several albums that have been continuously available to the public since then. The Drifters continued to record hit songs through 1966; by that time Thomas, Hobbs and Green, as well as others who had participated in the hit songs, had for various reasons stopped singing actively with the group.

### The Period Subsequent to 1970

Thomas, Hobbs and Green resumed performing together under the name of The Drifters in 1969 and have been managed by plaintiff Marshak since 1971. During the 1970s, Thomas, Hobbs and Green now and then performed along with one or two others and continued to be recognized by the public as "The Drifters." Under the plaintiff's direction, they made records, tapes, appeared on television and performed live concerts throughout the country (including one at the White House).

■ There is no evidence that during this decade any other group was so identified by the public as The Drifters, or that any other group had an unrestricted right to the name, although defendants sought to prove that plaintiff's group was not the exclusive user of the name "The Drifters."[4] Thus, they suggested that Faye Treadwell, George Treadwell's widow, has continued to manage a group of Drifters since his death,

and that this group had at least as great a right as plaintiff to "The Drifters" name. But the evidence was insufficient to support this claim. The evidence establishes that following a 1971 infringement suit brought by Mrs. Treadwell against Marshak in New York State Supreme Court, she had agreed to restrict her group's performances to Europe. Further, defendants asserted that Bill Pinckney, a former member of the group, currently performs under "The Drifters" name. Again, defendants offered no direct evidence substantiating this position; to the contrary, the proof establishes that Marshak has an agreement with Pinckney licensing Pinckney to use "The Drifters" name only in the South.

Typical of defendants' efforts in support of their position that plaintiff's use of "The Drifters" is not exclusive is the testimony of James Hudson, a rock manager and producer. He testified that, throughout the 1970s, he booked plaintiff's group and understood The Drifters to include Thomas, Hobbs, Green and another. Although he heard of others using the name, he was not personally familiar with them nor did he know if they had any right to the name. This vague and inconclusive testimony fails to support defendants' claim that plaintiff's group did not have exclusive use of the service mark prior to applying to register it in 1976.[5]

In 1976, after reading that another singing group, The Platters, had, because of their service-mark registration, been successful in preventing others from using its

---

**4.** This claim parallels defendants' assertion that many who sang with The Drifters in the late fifties and early sixties left the group and performed separately under "The Drifters" name, thereby defeating plaintiff's claim of a superior right to the name. Both claims suffer from the same defect: there is no direct evidence to support the view that other individuals or groups extensively used "The Drifters" name, or that they were recognized by the public and the industry as "The Drifters," or that they had a right to perform as "The Drifters." Further, some former lead singers, like Clyde McPhatter, left the group to pursue successful careers as individual singers and became known to the public in their individual capacities.

**5.** Nor is it a defense that other groups may use "The Drifters" name. As suggested above, these groups do not necessarily have a right to the name, or may have negotiated a license to use the name under certain conditions. *See Admiral Corp. v. Penco, Inc.*, 203 F.2d 517, 521 (2d Cir. 1953); *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 422–23 & n.9 (S.D.N.Y.1980) (and cases cited therein); *Lucien Piccard Watch Corp. v. Crescent Corp.*, 314 F.Supp. 329, 332–33 (S.D.N.Y. 1970); *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 865 (S.D.N.Y.1962), *aff'd*, 312 F.2d 125 (2d Cir. 1963).

name,[6] plaintiff urged Thomas, Hobbs and Green to apply to register "The Drifters" to protect their right to the exclusive use of the name. Marshak agreed that, if they assigned their rights under the application to him, he would continue as their manager and be vigilant in stopping others from using "The Drifters" name. The three considered plaintiff's offer out of his presence and for their mutual benefit signed both the application and the assignment of their own free will and with the understanding that the purpose was to protect their right to the name.[7] As already noted, the service mark was finally registered on January 3, 1978. Since then, Marshak has been active in policing the mark and instituted several lawsuits based on alleged infringement.

Thomas, Hobbs and Green continued to perform together under plaintiff's management until June 1979, when Green, claiming dissatisfaction with the group's financial arrangements, broke away and formed another group, managed by defendant Rick, also using the name "The Drifters." Green's group, which performs in the same style as plaintiff's, has appeared in many of the same locations as plaintiff's and solicited trade through many of the same agents and clubs.[8]

■ The essence of plaintiff's infringement and unfair-competition claims, under both federal and New York law, "is that the use of the infringing term creates the likelihood of consumer confusion; the facts supporting both are also substantially the same. The essential inquiry is whether an appreciable number of ordinarily prudent prospective [customers] are likely to be confused or misled."[9] Several factors are considered, including the strength of the prior user's mark, the degree of similarity, and the defendants' good faith in adopting the mark.[10]

■ Plaintiff has clearly shown a likelihood of confusion. Defendants' group has performed in the same areas and in the

6. *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372 (D.Md.1976).

7. Green's testimony at trial that, though he signed the application, he did not believe he had the right to exclude others from the name, is directly contradicted by his deposition testimony. Further, he acknowledged signing the application and that he understood that a false statement on it carries a criminal penalty. In all the circumstances, his statement at trial is not entitled to great weight.

8. *See Five Platters, Inc. v. Purdie*, 419 F.Supp. 372, 379–80 (D.Md.1976).

9. *Stix Products, Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 493 (S.D.N.Y. 1968). *See Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 325, 59 S.Ct. 191, 196, 83 L.Ed. 195 (1938); *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 154 (S.D.N.Y.1980); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *CBS, Inc. v. Springboard Int'l Records*, 429 F.Supp. 563, 566 (S.D.N.Y.1976); *Apollo Distrib. Co. v. Apollo Imports Inc.*, 341 F.Supp. 455, 458 (S.D.N.Y. 1972); *N.S. Meyer, Inc. v. Ira Green, Inc.*, 326 F.Supp. 338, 341–42 (S.D.N.Y.1971); *Atlantic Monthly Co. v. Frederick Ungar Publishing Co.*, 197 F.Supp. 524, 529 (S.D.N.Y.1961); *G.B. Kent & Sons, Ltd. v. P. Lorillard Co.*, 114 F.Supp. 621, 629–30 (S.D.N.Y.1953), *aff'd on opinion below*, 210 F.2d 953 (2d Cir. 1954); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544–45, 399 N.Y. S.2d 628, 631–32, 369 N.E.2d 1162, 1165–1166 (1977).

Plaintiff's claim under the New York anti-dilution statute, N.Y.Gen.Bus.Law § 368–d (McKinney's 1968), encompasses the same general inquiry; however, the thrust of this claim is not public confusion "but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trade-mark or name. . . . The harm that section 368–d is designed to prevent is the gradual whittling away of a firm's distinctive trade-mark or name." *Allied Maintenance, supra* at 545, 399 N.Y.S.2d at 632, 369 N.E.2d at 1166. The thrust of the anti-dilution statute is to enlarge the range of causes of action for a plaintiff beyond the traditional ones of infringement and unfair competition. *Id.* at 543, 399 N.Y.S.2d at 630, 369 N.E.2d at 1166. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366 (S.D.N.Y.), *aff'd*, 604 F.2d 200 (2d Cir. 1979); *G.B. Kent & Sons, Ltd. v. P. Lorillard Co.*, 114 F.Supp. 621 (S.D.N.Y.1953), *aff'd on opinion below*, 210 F.2d 953 (2d Cir. 1954).

10. *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

same style as plaintiff's; they use the same name; they are in direct competition. Green himself testified that the public, in buying tickets to a concert, was likely to be confused as to which group was performing. Further, producer Hudson, called as a witness by defendants, testified that, whenever he booked defendants' group, he could not guarantee that plaintiff's group would not appear in the same area.

Defendants in their own promotional material make no attempt to distinguish between the groups. In one such example, a flyer, defendants describe Green as an original member of The Drifters and as having appeared with the group in concerts, on television, and on records, none of which refers to defendants' group. The flyer lists eleven hit recordings, including "There Goes My Baby" and "Save The Last Dance For Me," all of which were recorded well before 1979, when Green's group was formed. Finally, it designates defendant Rick as the person to contact to book the group.[11] Defendants in promoting their own group were thus trading on the name and goodwill of plaintiff's group.

Moreover, defendant Rick evinced an express intention to capitalize on plaintiff's goodwill. Having been sought out by Green for help in forming a new group after Green left plaintiff's group, Rick chose the name The Drifters precisely because "[t]he only thing that draws is a name that is well known or halfway known or whatever," and that The Drifters is such a name.[12] In short, defendants intended to capitalize on plaintiff's right to the use of "The Drifters." They deliberately used the name aware they had no right thereto, with consequent confusion of the public.

Plaintiff has affirmatively established that "The Drifters" is a valuable name that has been well known both within the industry and to the consuming public over a long period of time. Indeed, Rick clearly acknowledged that in selecting the name for his own group. He further noted that, in his capacity as an agent before he formed his own Drifters group with Green, when he wanted to book The Drifters, he would contact Marshak.[13]

From the time Thomas, Hobbs and Green resumed performing together in 1969 until

---

**11.** The flyer in its entirety reads:

THE DRIFTERS
ORIGINAL DOCK GREEN
DOCK GREEN AN ORIGINAL MEMBER OF THE DRIFTERS STARTED IN 1959. THE ACT BECAME ONE OF THE GREAT GROUPS OF THE ROCK AND ROLL ERA. THROUGHOUT THE YEAR, DOCK GREEN AND HIS GROUP HAVE BEEN VERY ACTIVE IN DOING CONCERTS, T.V., CLUB DATES, AND RECORDINGS IN THE UNITED STATE AND OVER SEAS. [sic] THE GROUP WITH THEIR FOUR SUPERIOR FRONT VOCALS, ARE SELF CONTAINED, DOING TWO CONCERT SETS, AND THE BAND DOING TWO DANCE SETS IF NEEDED. THE ACTS HIGH QUALITY VOCAL, STAGE PRESENTATION AND SHOWMANSHIP IS VERY STRONG AND UNIQUE, MAKING THEM A TOP PERFORMING ACT.
(HIT RECORDINGS)
UP ON THE ROOF
UNDER THE BOARDWALK
THIS MAGIC MOMENT
SAVE THE LAST DANCE FOR ME
ON BROADWAY
THERE GOES MY BABY
DANCE WITH ME
SPANISH HARLEM
WHITE CHRISTMAS
SATURDAY NIGHT
COUNT THE TEARS
TO GUARANTEE THE GROUP APPEARING FOR ANY ENGAGEMENT, ALL ADVERTISING MUST BE AS SPECIFIED.
THE DRIFTERS
ORIGINAL DOCK GREEN
FOR INFORMATION PLEASE CONTACT YOUR LOCAL AGENT, OR CALL.
DAVE RICK
212–251–3073
See *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372, 380 (D.Md.1976).

**12.** Hearing on preliminary injunction. Tr. at 61. At the injunction hearing, Rick testified that he "couldn't get bookings because there is no value" if he did not use "The Drifters" name for his new group. He added, "The value of, moneywise, in the entertainment field is the name." Finally, when the Court asked if new performers could not "come in under their own names, develop a reputation and get bookings," Rick replied, "No." *Id.* at 59–60.

**13.** Rick added that others booked other Drifters groups; as noted *infra*, however, the possible existence of other such groups does not aid the defense. The point here is that Rick himself booked The Drifters through Marshak.

Green left the group in 1979, these men were recognized by the public as The Drifters, and they were a unit when they applied to register their mark in December 1976 and assigned all their rights in the application for the mark to plaintiff Marshak.

■ The registration for the service mark "The Drifters," issued on the application of defendant Green and Thomas and Hobbs, his co-partners, is prima facie evidence of the validity of the mark.[14] Thus, in challenging its validity, defendants Green and Rick not only have the burden of coming forward with evidence, but also they "must put something more into the scales than the registrant."[15] Defendants have simply not met this burden on any of their defenses.

With respect to their defense of nonexclusive use, they have produced no competent, direct evidence to support their claims that other groups used and had a right to "The Drifters" name. No member of such a group testified, nor were any indicia of their existence, like recordings or billboards, produced.

■ Further, defendants' attack on the service-mark application itself is unavailing. They contend that the application contains false allegations as to exclusive use, continuous use, and first use. Putting aside for the moment the issue whether they are estopped from challenging statements Green made under oath and from which he benefitted for several years until he left plaintiff's group, defendants have not met their burden of proof. First, they have utterly failed to present adequate proof that plaintiff's group's use was not exclu-

sive. Further, Drifters' records have been continuously available, and defendants have not demonstrated any intention by plaintiff's assignors to abandon the name. Finally, any irregularity in the alleged date of first use—1959—was insignificant and not prejudicial.[16]

■ There are additional considerations in rejecting defendants' attack on the application. Although, in general, neither opposition to registration nor a petition for cancellation under 15 U.S.C., section 1064, is a prerequisite to a cancellation counterclaim in an infringement action, failure to act at the administrative level by one in a position to do so may make such a counterclaim "smack of tactical afterthoughts."[17] Here, Green swore to and signed the application seeking the benefits of the registration and the assignment of the application to Marshak; Rick knew all along of plaintiff's group and the great value of its name, though he denied specific knowledge of the registration until shortly before the suit was commenced; and Green continued to perform with plaintiff's group after the application was filed and, indeed, for over a year after the registration was final.

■ Defendants' failure to meet their burden on this issue is wholly apart from any considerations of estoppel to attack the application which Green signed and from which, for a time, he reaped benefits. Courts adhere to traditional common-law contract principles even in trademark cases as long as holding a party to his obligations is not inconsistent with the public policy of preventing confusion and deception as to

**14.** *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14 (2d Cir. 1976); 15 U.S.C. § 1115(a).

**15.** *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14 (2d Cir. 1976) (*quoting Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp.*, 259 F.2d 314, 316 (2d Cir. 1958)).

**16.** *Cf. Five Platters, Inc. v. Purdie*, 419 F.Supp. 372, 384 (D.Md.1976); *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341, 1368–69 (E.D.Pa.1972), *aff'd*, 480 F.2d 917 (3d Cir. 1973) (unknowingly false statements in application do not in any case affect common-law rights which are based on use); *Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.*, 339 F.Supp. 973, 984 (M.D.Tenn.1971), *aff'd*, 470 F.2d 975 (6th Cir. 1972); *Simmons Co. v. Cantor*, 57 F.Supp. 992, 996 (W.D.Pa. 1944).

**17.** *Haviland & Co. v. Johann Haviland China Corp.*, 269 F.Supp. 928, 937 (S.D.N.Y.1967).

the origin of goods or services.[18] Where a party, as here, applies for the benefits of service-mark registration and then receives such benefits over a period of time, he is estopped from challenging the validity of the mark under these traditional principles.[19]

Defendants' contention that the assignment of the application to plaintiff was invalid is without merit. Marshak's promise to provide greater protection for the name was adequate consideration for the promise, and the instrument itself recites that consideration was furnished. Further, defendants' claim that no goodwill was transferred by this assignment[20] is without merit. Not only did the instrument itself provide for the transfer of goodwill, but also the use of the mark—that is, the singing in The Drifters style by Thomas, Hobbs and Green—remained unchanged in the public eye. The essence of what Marshak acquired was "the right to inform the public that [he] is in possession of the special experience and skill symbolized by the name of the original concern, and of the sole authority to market its [services]."[21] Here, the goodwill was clearly transferred.

The record thus indicates that plaintiff's mark is valid and strong, that defendants use the same name in the same manner as does plaintiff, and in the same geographic area. Plaintiff has demonstrated that defendants' use of "The Drifters" infringes on his mark, is likely to confuse the consuming public and, further, constitutes unfair competition. Moreover, the infringement was intentional. "That [defendants] persuaded [themselves they] had a legal right to pursue the course [they] did diminishes neither the fact of [their] violation of [Marshak's] rights, nor the force of its impact upon the consumer. That a course is stubbornly pursued does not render it innocent. The very persistence in the infringing conduct over the prompt protest of [Marshak] not only emphasizes its wilfulness, but continues the wrong, entitling [Marshak] to judicial redress."[22]

Marshak is thus entitled to a decree as sought by him enjoining defendants from continuing to perform under the name "The Drifters" or any variant thereof. The decree shall include a prohibition against use of the mark "The Drifters" on any billboard or other promotional material and a requirement that defendants surrender to plaintiff any promotional materials bearing the name "The Drifters."

The defendants' conduct was deliberate and intended to pirate potential customers from the plaintiff by their unjustified use of "The Drifters." Their conduct was calculated to appropriate the goodwill attaching to plaintiff's right to "The Drifters." As a result, the defendants were unjustly enriched, and this alone entitles plaintiff to an accounting. An accounting is further justified to deter others in similar positions from infringing valid marks.[23]

**18.** *E. g., T & T Mfg. Co. v. A. T. Cross Co.,* 587 F.2d 533 (1st Cir. 1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2000, 60 L.Ed.2d 377 (1979); *Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326, 328–29 (6th Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 66, 33 L.Ed.2d 108 (1973); *E. F. Prichard Co. v. Consumers Brewing Co.,* 136 F.2d 512, 522 (6th Cir. 1943), *cert. denied,* 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060 (1944); *Peyrat v. L. N. Renault & Sons, Inc.,* 247 F.Supp. 1009 (S.D.N.Y.1965).

**19.** *See, e. g., Pavone v. Aetna Cas. & Sur. Co.,* 91 Misc.2d 658, 398 N.Y.S.2d 630, 634 (Sup.Ct. Monroe Co.1977) (and cases cited therein).

**20.** It is axiomatic that the goodwill of the business must be transferred along with the mark, for the mark is nothing without the goodwill it symbolizes. *E. g., Mister Donut of America,*

*Inc. v. Mr. Donut, Inc.,* 418 F.2d 838 (9th Cir. 1969).

**21.** *Levitt Corp. v. Levitt,* 593 F.2d 463, 468 (2d Cir. 1979).

**22.** *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 499 (S.D.N.Y. 1968). *See Menendez v. Holt,* 128 U.S. 514, 523, 9 S.Ct. 143, 145, 32 L.Ed. 526 (1888); *G. H. Mumm Champagne v. Eastern Wine Corp.,* 142 F.2d 499, 502 (2d Cir.), *cert. denied,* 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944).

**23.** *W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 664 (2d Cir. 1970); 15 U.S.C. § 1117 (Supp. 1980). *See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge & Co.,* 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942) (no recovery of

Plaintiff has met his burden and shown gross receipts for concerts actually performed by defendants' group in the amount of $31,450. Although defendants failed to put in any evidence on elements of cost or deduction, as required by the statute,[24] this Court in equity must seek a realistic figure for defendants' profits. Marshak himself testified that the deductible expenses for a group, even before paying performers, were considerable, including commissions, gas and tolls, amortization of vehicle, uniform rentals and general office expenses. However, no precise figures were supplied. In the circumstances, the Court will afford the defendants an opportunity to submit evidence with respect thereto. A hearing is set for Tuesday, February 3, 1981, at 2:15 p.m., courtroom 1506, at which time the evidence will be limited to deductible expenses from gross income.

■■■ Plaintiff also seeks to recover attorneys' fees under an amendment to section 35 of the Lanham Act allowing such fees "in exceptional cases."[25] Despite defendants' intentional infringement of plaintiff's mark, the Court, exercising its discretion, finds that the circumstances do not warrant an award of attorneys' fees in this case.[26] Plaintiff is entitled to taxation of statutory costs.

■■■ Defendant Green has failed entirely in presenting evidence in support of his counterclaim for damages and an accounting of monies allegedly owed him by Marshak arising out of Green's performances with plaintiff's group through 1979. Although Green expressed dissatisfaction with the amounts received for various performances, in part because he believed that others were earning more money, he conceded that he had no financial records, relied on what others knew or speculated on for his information, and did not know the amount of expenses deducted from gross receipts. In the circumstances, and considering that Green continued to perform with plaintiff throughout the 1970s without filing suit, Green's counterclaims must be dismissed.

Submit decree in accordance with the foregoing.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

damages without showing wrongful intent); Pastificio Spiga Societa per *Azioni v. DeMartini Macaroni Co.*, 200 F.2d 325, 327 (2d Cir. 1952). *Cf. Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir. 1980) (no damages to be awarded absent showing of actual confusion); *D. C. Comics, Inc. v. Filmation Associates*, 486 F.Supp. 1273 (S.D.N.Y.1980).

**24.** 15 U.S.C. § 1117 (Supp.1980).

**25.** *Id.* The precise definition of "exceptional" is left unclear, though the legislative history suggests that it would include cases in which the infringement was malicious, fraudulent, willful, or deliberate. S.Rep. No. 93-1400, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News, pp. 7132, 7133. Award of attorneys' fees is left to the discretion of the District Court.

**26.** *Cf. Levitt Corp. v. Levitt*, 593 F.2d 463, 470 n.13 (2d Cir. 1979) (no award of attorneys' fees despite infringer's willful violations). *Compare Salton Inc. v. Cornwall Corp.*, 477 F.Supp. 975, 992–93 (D.N.J.1979), *and Jones Apparel Group, Inc. v. Steinman*, 466 F.Supp. 560, 564 (E.D.Pa. 1979) (both cases declining to award attorneys' fees), *with Amana Society v. Gemeinde Brau, Inc.*, 417 F.Supp. 310, 311–12 (N.D.Iowa 1976) (awarding attorneys' fees). Nor would plaintiff be entitled to attorneys' fees on his state unfair-competition claim. *See Textron, Inc. v. Spi-Dell Watch & Jewelry Co.*, 406 F.2d 544, 545–46 (2d Cir. 1968).