**David RICK, Plaintiff,**

v.

**Sheldon BUCHANSKY, Edward Pardocchi, James Spinelli, Frankie Graziano, Charles Garone, Vito Balsamo and Charles Garone d/b/a Stellar Productions, Defendants.**

**No. 82 Civ. 3906 (RJW).**

United States District Court,
S.D. New York.

June 3, 1985.

Sbeglia & Shames, New York City (Richard Sbeglia, New York City, of counsel), for plaintiff.

Lowell B. Davis, Kew Gardens, N.Y., for defendants.

## OPINION

ROBERT J. WARD, District Judge.

This action is brought pursuant to the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.* Jurisdiction is based upon 28 U.S.C.

§ 1338(a) and principles of pendent jurisdiction. Plaintiff, David Rick, a manager and promoter of musical groups, holds the registered service mark for "VITO AND THE SALUTATIONS." The mark, not coincidentally, is the name of a "doo-wop"[1] musical group Rick has managed since its formation in 1961. Defendants Buchansky, Pardocchi, Spinelli, Graziano and Balsamo, all of whom performed at some time in the group managed by Rick, have formed a second musical group that also performs under the name "Vito and the Salutations" and is managed by defendant Garone d/b/a Stellar Productions.

The amended complaint sets forth ten claims for relief, principally for trademark infringement, unfair competition, breach of contract and malicious interference with contractual relations.[2] The relief sought by plaintiff includes a permanent injunction, an accounting for profits, and both compensatory and punitive damages. Defendants deny plaintiff's claims, assert several affirmative defenses,[3] and raise three counterclaims. Defendants' first counterclaim charges plaintiff with infringing on defendant Balsamo's alleged rights in the name "Vito and the Salutations." The remaining two counterclaims pertain to false and fraudulent statements purportedly made by plaintiff in connection with the registration of his service mark.

On July 9, 1982, after a two-day evidentiary hearing, this Court preliminarily enjoined defendants from using "Vito and the Salutations" as the name of their musical entertainment group. During the two and one-half years that followed, the case was actively litigated. After the completion of additional discovery, the parties amended their pleadings, waived a jury trial, and agreed to bifurcate liability and damage issues. The liability stage of the trial began on March 28, 1985 and lasted six days.

The Court, having heard the testimony adduced during the six-day trial as well as at the previous two-day hearing, having examined the exhibits admitted into evidence at both proceedings, having reviewed its contemporaneous trial notes, which include the Court's appraisal of the witnesses and their demeanor, and having evaluated the pertinent legal principles, finds, upon the totality of the testimony and documentary evidence adduced at trial, that plaintiff is entitled to a permanent injunction and that defendants are not entitled to relief on their counterclaims. The Court reserves decision on plaintiff's contract and tort claims pending receipt of additional evidence at the ensuing trial on the issue of damages. The following opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.

## BACKGROUND

In its oral decision rendered July 9, 1982 on plaintiff's motion for a preliminary injunction, this Court recounted in detail the facts giving rise to the instant lawsuit. The Court finds it necessary to review, once again, the relevant details and events in the history of the parties' relationship, as further substantiated by the evidence adduced at the recent six-day trial. Famil-

---

1. Norm N. Knight, a disc jockey for CBS–FM, a New York radio station, who testified at trial as a self-pronounced "expert" on popular music, defined "doo-wop" as "barbershop harmony with a beat."

2. Plaintiff's claims for relief, even in their amended form, are unclear and at times redundant. As construed by the Court, the amended complaint raises the following: 1) a federal claim of trademark infringement, brought pursuant to relevant provisions of the Trademark Act of 1946, 15 U.S.C. § 1051 et seq.; 2) a state statutory claim of trademark dilution, brought pursuant to N.Y.Gen.Bus.Law § 368–d; and 3) state common-law claims of unfair competition, breach of contract, malicious interference with contractual relations, and prima facie tort. Plaintiff raises four additional claims, but they are fairly encompassed within the principal claims noted above.

3. These include: 1) that plaintiff is not the true owner of the service mark; 2) that the registered mark is invalid; 3) that plaintiff has abandoned any rights in the mark; 4) that plaintiff is barred from relief by laches; and 5) that plaintiff's claim for relief is barred under the "unclean hands" doctrine.

iarity with the Court's decision of July 9, 1982, however, is assumed.

The instant tale of shortlived success in the mercurial world of popular music begins in late summer or early fall of 1961, when David Rick, already an established manager and promoter of modestly successful musical groups, discovered four young men on a street corner in Brooklyn, singing in the popular "doo-wop" style of the time.[4] Impressed with the group's apparent talent, Rick invited them to an audition in Manhattan. Robert DiPaolo and Barry Solomon, two members of the foursome, accepted plaintiff's invitation and appeared for the audition accompanied by Dominick Mitchell and Vito Balsamo, the latter a friend of DiPaolo's brother Johnny. All four were in their teens. Balsamo, the youngest, was fifteen at that time.

After hearing the group audition, plaintiff offered to act as the group's manager and promoter. The members of the group, after some deliberation, agreed. Various names for the new group were considered. Plaintiff suggested "The Salutations," which met with the approval of the young performers.[5] On November 18, 1961, plaintiff entered into a management agreement ("1961 Agreement") with DiPaolo, Mitchell, Solomon and Balsamo, collectively described in the agreement as "The Salutations." Shortly thereafter, however, plaintiff decided that the group should not be billed merely as "The Salutations." As this Court explained in its 1982 decision, "doo-wop" groups of the period frequently augmented the name of the group with the first name of a group member, as in "Dion and the Belmonts" or "Jay and the Americans." Having previously discussed the matter with Vito Balsamo, Rick suggested to the group that it should be named "Vito and the Salutations." All agreed.[6]

In the years that followed, "Vito and the Salutations" tasted briefly of commercial success and popular acclaim. "Gloria," one of the first songs recorded by the group, became a "hit" in the New York area. In 1963 the group recorded "Unchained Melody," which climbed the popular music charts nationwide. The group made several live concert appearances during the early 1960s and also performed on television. Nevertheless, with the "British invasion" of the United States by such popular musi-

---

**4.** *See supra* note 1. Defendants suggest that plaintiff's recollection of his first encounter with the original members of the musical group is akin to the "romantic stories ... from 'Schwabbs' drug store in Hollywood, where a disproportionate number of young starlets were discovered in the 1950's." Defendants' Proposed Findings at 2 n. 1. Nonetheless, Rick's version of the story is corroborated by the testimony of both Barry Solomon and Robert DiPaolo, who were among the four streetsingers Rick chanced upon on that day in 1961.

**5.** At trial, plaintiff testified that he had originally conceived of the name. An album cover offered in evidence by defendants suggests a slightly different story. The album was produced by plaintiff in 1981, and contains both first releases and rereleases of songs recorded years earlier by "Vito and the Salutations." On the back cover of the album, Rick explains that he was inspired to choose the name "The Salutations" by Douglas "Jocko" Anderson, a radio personality of the early 1960s, who began his radio program with the phrase, "Greetings and Salutations." Whether plaintiff "created" the name "The Salutations," or borrowed it from the familiar greeting of a disc jockey of the time, the preponderance of testimony adduced

at the evidentiary hearing and at trial establishes that it was plaintiff who first conceived of using the name to identify the "doo-wop" group formed under his management in late 1961.

**6.** Various reasons have been offered for choosing Vito's name. Balsamo himself testified that Rick had suggested that his name be used because Balsamo "had the most talent in the group." Rick, in contrast, testified at trial that "Vito" was chosen because it "flowed easy." Barry Lynn, a musician who performed with the group in its early days and was present when the group's name was under discussion, recalled that "Vito" was selected because it had a "nicer ring."

On the facts of the case, it appears likely to the Court that "Vito" was added to "The Salutations" both because that was the name of the original group's falsetto lead and because the name was distinctive. The Court need not conclusively resolve the inconsistencies in testimony on the issue, however, because plaintiff's motivation in adding "Vito" to the name of the musical group is not directly relevant to the trademark infringement claim at hand. Rather, the relevant inquiry under trademark analysis is directed to the meaning and associations a given name or mark has acquired in the minds of the public.

cal groups as the Beatles, the Dave Clark Five, and the Rolling Stones, and with the rising popularity of such Motown recording artists as Smokey Robinson and the Miracles, the Temptations, and the Supremes, the "doo-wop" era came suddenly to an end. "Vito and the Salutations" never made a commercially successful record after 1963, although plaintiff managed to book engagements for the group through the remainder of the 1960s and into the 1970s.

"Vito and the Salutations" experienced frequent turnovers in personnel almost from its inception. Within a year of its formation, three of the group's original members—DiPaolo, Mitchell and Solomon—had left. Vito Balsamo, the fourth original member, left the group several times during the 1960s for brief periods, working at one time in a factory. He rejoined the group in 1972 and remained until 1974. Since 1974, Balsamo has not performed in the group under plaintiff's management. Until 1978 he worked with various bands in the New York area, after which he moved to South Carolina, where he remained through 1979.

During the 1960s and 1970s, approximately twenty-two different persons performed in the group at one time or another. The group's continued ability to secure bookings for live performances despite the rapid turnover must be attributed largely to the management and promotional efforts of plaintiff. In the 1982 decision on plaintiff's preliminary injunction motion, this Court likened plaintiff's task in managing the group to that of the producer or director of a long-running Broadway play, who must constantly find new performers to fill established roles without substantially altering the nature of the show itself. So Rick, as manager and promoter of "Vito and the Salutations," conceived of the group's performance as an "act" in which each member played a particular role. As individuals left the group, others were found to replace them and to assume their respective parts.

The lead singing role in the group, for example, was that of "Vito." Until 1974, this part was played customarily by Vito Balsamo. However, other individuals had occasion to play the role of "Vito" during this period, either because Balsamo was unable to perform or because he had left the group for a time. After Balsamo's departure in 1974, a number of individuals performed as "Vito." It is estimated that at least ten persons in addition to Balsamo played the role of "Vito" in "Vito and the Salutations" during the 1960s and 1970s.

Perhaps the most hotly contested factual issue in this case has been plaintiff's role as manager of "Vito and the Salutations." The testimony adduced at trial on the issue varied widely and reflected, in large part, the self-interest of the individuals testifying. Plaintiff and Barry Solomon, one of the original "Salutations" and a witness for plaintiff, testified that Rick not only made booking arrangements and handled promotional and financial matters for the group, but that he selected songs, taught vocal and dance technique, and paid all of the group's expenses, including the purchase of stage apparel, meals and lodging. In contrast, defendants Graziano, Buchansky and Balsamo, who had each performed in the group under Rick's management at some time, testified that they had received no vocal or dance training from Rick, and that the group had paid its own expenses.

After the two-day evidentiary hearing held on plaintiff's preliminary injunction motion in 1982, this Court concluded that in his role as manager of "Vito and the Salutations," plaintiff had not acted simply as an agent for the group, but had functioned much like the producer of a theater company or owner of a sports team. The testimony and documents proffered by defendants at trial has not persuaded the Court differently. While the Court would not go so far as to endorse plaintiff's characterization of himself as the artistic wellspring of "Vito and the Salutations," it remains clear that he was far from a mere booking agent. Records adduced at trial demonstrate that Rick paid many if not most of the group's recording, travel and clothing expenses.

In addition to arranging for studio recording time and scheduling the group's live performances, Rick was responsible for the group's personnel decisions and oversaw the style and substance of the group's "act." Indeed, no other party to this action—or any other individual of whom the Court has knowledge—has been in a comparable position to influence the direction of "Vito and the Salutations" from 1961 until the present. Having managed the musical group continuously since 1961, Rick is, in a sense, its "longest-playing" member, albeit a behind-the-scenes participant.

On January 14, 1980, plaintiff filed an application for the service mark "VITO AND THE SALUTATIONS" with the United States Patent and Trademark Office ("U.S. Patent Office"). Whatever was the impetus for registering the service mark,[7] plaintiff's application went unopposed and was granted effective September 15, 1981.

By 1980, "Vito and the Salutations" consisted of defendants Buchansky, Graziano, Pardocchi and Spinelli. Buchansky and Graziano had each sung with the group briefly in the 1960s and had returned in 1978. Pardocchi and Spinelli joined the group for the first time in 1978. Pardocchi was then performing the role of "Vito." The members of the group had entered into an agreement with plaintiff dated February 21, 1980 ("1980 Agreement"), whereby plaintiff was made each member's exclusive manager and agent for one year, and held an option to renew the agreement for an additional two-year period. Rick testified at trial that the only group member with whom he discussed the pending service mark application was Graziano.

Within months of signing the 1980 Agreement, a dispute arose between plaintiff and the group's members. The group expressed a desire to record an album with Life Stream Records, Inc. ("Life Stream"). When plaintiff refused to go along with this proposal, the group proceeded to record the album without plaintiff's knowledge. Through their dealings with Life Stream and its owner, Joel Warshaw, the group became acquainted with defendant Charles Garone. Garone expressed interest in managing the group himself, and even approached plaintiff with an offer to purchase the group from him. Rick rejected the offer. However, Garone was eventually successful in convincing the group's members to leave Rick's management for his. On October 15, 1980, the members of the group entered into a management agreement ("Garone Agreement") with Garone, who began booking the group for live performances under the name "Vito and the Salutations." Vito Balsamo joined Garone's group in late 1980 and assumed the role of "Vito" at the group's live concert appearances. Meanwhile Pardocchi, who had been playing the part of "Vito," remained in the group and assumed a different role.

When plaintiff learned of the group's defection, he promptly informed them that he viewed Buchansky, Graziano, Pardocchi and Spinelli to be in breach of the 1980 Agreement. Moreover, Rick asserted that the group's use of the name "Vito and the Salutations" infringed his rights in the name. Plaintiff's demands—that the group cease performing for Garone, cease recording with Warshaw, and cease using the name "Vito and the Salutations"—went unheeded. Plaintiff did manage, however, to recruit replacement members for his group. They included three returning members, Robert DiPaolo, Barry Solomon

---

**7.** Rick's motivation for seeking to register the group's name as a service mark at this time is the subject of some speculation. As he testified at the evidentiary hearing in 1982, Rick may simply have been following the advice of friends in the music business who had, themselves, become embroiled in disputes over the right to use a musical group's name. Alternatively, Rick may have been prompted by his own experience as a defendant in a trademark infringement case involving members of another musical group, "The Drifters." *See Marshak v. Green,* 505 F.Supp. 1054 (S.D.N.Y.1981). The Court itself need not speculate as to plaintiff's subjective intent in applying to register the group's name. The validity of the registered mark may properly be tested by examining the trademark application itself and the circumstances surrounding plaintiff's use of the mark in commerce.

and Mike Ercolano, together with Jim Russo, a newcomer, who was enlisted to play "Vito's" role. Ercolano's wife Cathy was also hired as a group member.

Nevertheless, Rick's rejuvenated group obtained few bookings. By the time the new group had rehearsed sufficiently to be prepared for a live performance, Garone's group had already appeared at many of the clubs where plaintiff sought to book his ensemble. The Garone group had quickly established itself on the "doo-wop" revival circuit, and club owners proved unwilling to book another group named "Vito and the Salutations" soon after an appearance by the group under Garone's management.

Plaintiff responded to this turn of events by filing suit in the Supreme Court of the State of New York, Kings County, asserting various state-law claims against most of the defendants named in the instant action. When plaintiff's federal registration of the service mark became effective, the state action was discontinued. Vito Balsamo promptly commenced an action in this Court, *Balsamo v. Rick*, 81 Civ. 7799(RJW), which sought, *inter alia*, the invalidation of plaintiff's service mark. Plaintiff filed a responsive action, *Rick v. Buchansky*, 82 Civ. 3721(CLB), which was assigned to Judge Brieant of this Court, who dismissed the complaint without prejudice. Plaintiff thereupon filed the instant action, which was assigned to this Court as related to *Balsamo v. Rick*. The two actions were subsequently consolidated.

## DISCUSSION

■ The purposes underlying the Trademark Act of 1946, also known as the Lanham Act, are well known: the "Act provides national protection of trademarks in order to secure to the owner of the mark the good will of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park and Fly*, —— U.S. ——, ——, 105 S.Ct. 658, 664, 83 L.Ed.2d 582 (1985). Trademark rights are acquired

through use. *Cartier, Inc. v. Three Sheaves Co., Inc.*, 465 F.Supp. 123, 127 (S.D.N.Y.1979); 3 R. Callmann, *The Law of Unfair Competition, Trademarks & Monopolies* § 19.01 (4th ed. 1983) ("3 Callmann § 19.01"). However, the ownership of a registered trademark is *prima facie* evidence of the validity of the mark and of the owner's exclusive right to use the mark in commerce. 15 U.S.C. § 1115(a); *Cartier, Inc. v. Three Sheaves Co., Inc., supra*, 465 F.Supp. at 127–28; *see also Marshak v. Green*, 505 F.Supp. 1054, 1060 (S.D.N.Y. 1981). Moreover, registration creates a rebuttable presumption that the mark is suggestive, arbitrary or fanciful rather than merely descriptive, and therefore entitled to federal trademark protection. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir.1976); *Cartier Inc. v. Three Sheaves Co., Inc., supra*, 465 F.Supp. at 128.

■ The standard for establishing liability in a trademark[8] infringement case is well established: "the crucial issue is 'whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question.'" *Miss Universe, Inc. v. Patricelli d/b/a Miss Venus U.S.A. Pageant*, 753 F.2d 235, 237 (2d Cir.1985) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). If a likelihood of confusion is found, the district court must, in addition, balance the equities to determine the appropriateness of granting injunctive relief. *See Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F.Supp. 915, 924 (S.D.N.Y.1981).

■ To determine the likelihood of confusion and to fashion equitable relief, the court considers a number of factors:

the strength of [the] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood

---

**8.** The same standard applies to service marks. *See* 15 U.S.C. § 1053; *Park 'N Fly, Inc. v. Dollar*

*Park and Fly, Inc., supra*, —— U.S. at ——, n. 1, 105 S.Ct. at 660 n. 1.

that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 17 (2d Cir.1985) (quoting *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)). Although originally applied in the context of noncompeting goods, the *Polaroid* factors may properly be considered in cases of competing products or services. *See Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir. 1985).

### Entitlement to Trademark Protection and Likelihood of Confusion

Turning to the trademark infringement issues raised in the instant case, the Court takes note first of those questions that are *not* presented to the Court for resolution. Most trademark cases involve a dispute either as to the entitlement of a particular mark for federal trademark protection or as to the likelihood of confusion between plaintiff's and defendant's respective marks. Neither issue is contested here.

■ As the Court observed in ruling on plaintiff's preliminary injunction motion in 1982, defendants concede that the mark "VITO AND THE SALUTATIONS" is entitled to federal trademark protection both because of its facial distinctiveness and because of the secondary meaning it has acquired over the last twenty-three years of its use. *See Thompson Medical Co., Inc. v. Pfizer Inc.*, *supra*, 753 F.2d at 212–13 (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, *supra*, 537 F.2d at 9–11). Indeed, as indicated earlier, plaintiff's mark is presumed eligible for trademark protection by virtue of its having been registered

with the U.S. Patent Office. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, *supra*, 537 F.2d at 11. Apart from the fact of its federal registration, however, "VITO AND THE SALUTATIONS," as used by both plaintiff and defendants to identify a musical entertainment group, is an "arbitrary" term that has developed distinct secondary meaning through its continuous use since 1961.[9] Plainly, therefore, the mark is entitled to the protection of the federal trademark laws. *See id.*

■ Defendants also do not question the likelihood of confusion between the "doo-wop" group managed by defendant Garone and that managed by plaintiff, both of which bill themselves as "Vito and the Salutations." Under the *Polaroid* factors outlined above, the mark at issue is "strong" both because of its arbitrariness and because of the secondary meaning it has developed over twenty-three years of use. In addition, the marks used by plaintiff and defendants are identical, and both are employed to identify "doo-wop"-style musical groups that perform in the same geographic area and attempt to attract the same audience. Because plaintiff's and Garone's groups are direct competitors, their use of the identical mark to identify themselves must inevitably cause confusion to the public. *See Marshak v. Green*, *supra*, 505 F.Supp. at 1058–59.

### Defenses

As the Court has already observed, defendants raise numerous defenses to plaintiff's claim of trademark infringement, some of which are more artfully pleaded than others.[10] As construed by the Court, the principal defenses raised in the action are the following. First, defendants contend that plaintiff is not the rightful owner of the mark "VITO AND THE SALUTATIONS," and therefore is not entitled to exclusive use of the mark in commerce.

---

**9.** In the trademark context, an "arbitrary" mark is one that makes use of a common word or words in an unfamiliar way. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d at 11 n. 12. In the instant case, a word that is

synonymous with "greeting" or "address" has been employed to identify a vocal entertainment group.

**10.** *See supra* note 3.

Second, defendants argue that the service mark registered to plaintiff by the U.S. Patent Office is invalid, primarily because the registration was granted in reliance upon false and fraudulent statements purportedly made by plaintiff. Third, defendants assert that even if plaintiff has acquired rights in the service mark at issue, he abandoned his rights. Finally, defendants raise laches and the "unclean hands" doctrine as equitable defenses that they argue preclude plaintiff from obtaining the injunctive relief he seeks. The Court examines each defense in turn.

### 1. Ownership of the Mark

■ As noted previously, plaintiff's registration of the service mark "VITO AND THE SALUTATIONS" is *prima facie* evidence that Rick owns the mark. 15 U.S.C. § 1115(a); *Cartier, Inc. v. Three Sheaves Co., Inc., supra,* 465 F.Supp. at 127–28. The statutory presumption in favor of plaintiff's ownership not only places upon defendants the burden of coming forward with evidence to rebut plaintiff's claim of ownership, but also shifts to them the burden of persuasion on the issue. *See Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 14; *see also Marshak v. Green, supra,* 505 F.Supp. at 1060. In other words, defendants must persuade the Court that plaintiff does *not* own the service mark "VITO AND THE SALUTATIONS" within the meaning of the federal trademark laws.

■ It goes without saying that rights in a trademark or service mark are acquired through appropriation and use of the mark in commerce. Thus, the mere conception of a mark, without its subsequent use in commerce, would be insufficient to confer rights on the conceiver of the mark under federal trademark law. *See LaMaur Inc. v. International Pharmaceutical Corp.,* 199 U.S.P.Q. (BNA) 612, 616–17 (Trademark Tr. & App.Bd.1978). Nonetheless, the question of who originally conceived of a particular mark may have some bearing upon the controlling issue of who first used the mark in commerce. The Court therefore considers both issues in turn.

The testimony adduced at trial with respect to the origination of the mark "VITO AND THE SALUTATIONS" was, not surprisingly, inconsistent. Plaintiff testified that it was he who had suggested both "The Salutations" and the addition of defendant Balsamo's given name, "Vito," to that name. Plaintiff's testimony was corroborated both by that of Barry Solomon, one of the group's original members, and by Barry Lynn, a musician who assisted the group in various capacities during its early years. Solomon and Lynn both testified that they had been present at Rick's house on two occasions in the fall of 1961 when possible names for the group were under discussion. Defendant Balsamo testified otherwise. It was his recollection that *he,* and not Rick, had suggested "The Salutations," although Balsamo conceded that it was Rick who proposed adding "Vito" to the group's name.

Viewing all of the testimony adduced on the issue, the Court concludes that the preponderance of the evidence supports plaintiff's contention that he conceived of "VITO AND THE SALUTATIONS" to identify the entertainment services of the musical group he managed beginning in November of 1961. The record further reflects that the mark was approved by a consensus of the group's original members, including defendant Balsamo, shortly after the signing of the 1961 Agreement, and that the mark was first used in commerce sometime in early 1962.

The critical issue for purposes of determining ownership of the mark, however, is whether plaintiff—or some other person or persons—first appropriated and used the mark in commerce. Because plaintiff has registered the mark, defendants must disprove plaintiff's prior appropriation and use to prevail on their defense. *See Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 14. Defendants' argument on the issue of ownership is two-pronged. Defendants first contend, as they did in their opposition to plaintiff's preliminary injunction motion, that the first users of the mark "VITO AND THE SA-

LUTATIONS" were the members of the musical group themselves, principally Vito Balsamo, whom defendants characterize not only as the group's lead singer from 1961 until 1974, but as the group's "leader." Under this theory, plaintiff is portrayed by defendants as a mere employee of the group, who at most acquired a "temporary lisence [sic]" to use the mark. *See* Defendants' Proposed Findings of Fact and Conclusions of Law ("Defendants' Proposed Findings") at 22. Defendants' alternative theory is that plaintiff could not have acquired ownership rights in the mark "VITO AND THE SALUTATIONS" without a valid assignment by Vito Balsamo of rights to that performer's name. *Id.* at 18. Because plaintiff has come forward with no evidence of a valid assignment of the name from Balsamo, defendants argue, plaintiff cannot successfully claim ownership of the service mark. In any event, defendants claim, Balsamo's name cannot validly be assigned. As the Court explains below, neither branch of defendants' argument is sustainable on the facts of the instant case.

a. Characterization of Rick's Role

As the Court observed in its 1982 decision on plaintiff's motion for a preliminary injunction, defendants' first theory of trademark ownership can succeed only if defendants' characterization of the relationship between the musical group's members and plaintiff—as one of employer and employee—is supported by the facts of the case. The Court concludes, after receipt of additional testimony and documentary evidence at trial, that the preponderance of the evidence supports no such characterization. The background section of this opinion makes clear that, from the beginning, Rick was not merely an agent or bookkeeper for the musical group he managed. The group was formed at Rick's instigation. It was Rick who proposed that the group perform as "Vito and the Salutations." Rick not only booked live appearances for the group and handled the

group's financial affairs, but also paid many of the group's expenses, arranged for the group to produce recordings, and made key personnel decisions. In general, Rick provided continuity to the group—despite frequent changes in the composition of the "doo-wop" foursome—by overseeing both the structure and style of the group's "act." [11]

The Court has already characterized plaintiff's role in the formation and development of "Vito and the Salutations" as akin to that of the producer of a theater company. Thus, to the extent one can fairly categorize the individuals affiliated with the musical group as either "employer" or "employee," it is Rick, and not the performers themselves, who functioned from the beginning as the "employer." When the group was formed in 1961 under Rick's management, all four singing members were in their teens, and none had any experience in organizing or promoting a musical entertainment group. Rick, on the other hand, was an established manager and promoter of musical groups, and therefore was in a position to provide leadership and direction to the newly formed "doo-wop" ensemble.

As the evidence demonstrates, plaintiff exercised almost complete discretion in matters involving the group's financing and promotion, made important personnel decisions, and exerted influence over the style and content of the group's "act." Furthermore, the composition of the performing group changed within months of its formation, and continued to change over the years. Therefore, no one set of performers, including the original four singers, remained with the group long enough to assert "control" over its style and direction.

Nor does the evidence indicate that any individual performer ever assumed a position of influence comparable to Rick's. Even defendant Balsamo, the group's lead

---

**11.** Rick's experience as manager would most likely have been different had he chosen the field of sports rather than entertainment. At least among New York sports teams, certain managers appear to have more difficulty retaining their own positions than they have in preserving a particular starting line-up of players.

singer for most of the period between 1961 and 1974, testified only that he had selected many of the songs that the group performed during his tenure. Defendants produced no documentary evidence, either at the evidentiary hearing or at trial, that Balsamo or any other performer in the group ever paid any of the group's expenses, handled the group's financial affairs, or promoted the group by means other than simply performing at live concerts and in recording sessions booked or scheduled previously by Rick.

In short, defendants have not persuaded the Court that in his role as manager and promoter of "Vito and the Salutations," plaintiff functioned merely as an employee of the performers themselves, such that he could not by his own actions have acquired ownership rights in the mark "VITO AND THE SALUTATIONS." Rather, the evidence supports the opposite conclusion: that, beginning in 1961, plaintiff assumed leadership and control of "Vito and the Salutations," and that he maintained control of the group through his active affiliation with it from 1961 until the present. Moreover, it is plaintiff who, in his role as the group's manager, most directly promoted the name "Vito and the Salutations" through the solicitation of live bookings and recording contracts, and through advertising the group's concert appearances and recordings. Therefore, if any individual is in a position to claim ownership of the mark "VITO AND THE SALUTATIONS" through prior and continuous use of the service mark in commerce, it is plaintiff.

b. Assignability of Balsamo's Name

Defendants have failed to rebut the statutory presumption that plaintiff is the owner of the registered mark "VITO AND THE SALUTATIONS" by arguing that the original members of the musical group, and not plaintiff, first appropriated and used the service mark in commerce. In the alternative, however, defendants contend that plaintiff's use of the mark cannot have conferred ownership rights upon him because plaintiff never received a valid assignment of the performer's name from Vito Balsamo.

The nature of defendants' "assignment" theory is not altogether clear. Defendants appear to be arguing that plaintiff could not have acquired rights in the mark "VITO AND THE SALUTATIONS" without first having obtained Vito Balsamo's permission to use the latter's name in commerce. However, defendants contend that Balsamo's name is one closely associated with a particular performer, and therefore could not validly have been transferred to plaintiff in any event. Defendants' Proposed Findings at 18–20. Defendants' "assignment" theory, so construed, is imaginative, but conforms neither to the facts of the instant case nor to applicable trademark law.

It is important to note, first of all, that the service mark at issue in this action is "VITO AND THE SALUTATIONS," not "VITO BALSAMO" or "VITO BALSAMO AND THE SALUTATIONS." Defendants' objection to plaintiff's use of the mark in question, therefore, is limited to Rick's use of the name "Vito" as part of the registered service mark. However, defendants do not contend that Balsamo has ever used the name "Vito" professionally, except to the extent he has performed in a musical group known collectively as "Vito and the Salutations." Moreover, Balsamo testified at trial that it was plaintiff who, in late 1961, had suggested adding "Vito" to the name of the "doo-wop" group newly formed under his management, and that Balsamo agreed with Rick's proposal.

■ In view of the facts presented in this case, the Court rejects defendants' initial proposition that plaintiff was required to obtain formal assignment of rights in the name "Vito" from defendant Balsamo before plaintiff could validly use the mark "VITO AND THE SALUTATIONS." To the extent that the law of trademarks accords special treatment to a trade or service mark that is based upon the name of a particular individual, see 3 Callmann § 19.-60, the law presumes that the name has been *used* in connection with a particular

trade or product so as to have acquired some secondary meaning in the marketplace. *See* 3A Callmann § 21.28. Thus, the right that attaches to one's personal name for trademark purposes is the right to use that name in connection with a particular business. *Id.* Even then, the right to use one's name commercially is not absolute. *John B. Stetson Co. v. Stephen L. Stetson Co.*, 85 F.2d 586, 587 (2d Cir.), *cert. denied*, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446 (1936); *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 826 (D.N.J. 1980); *Cartier, Inc. v. Three Sheaves Co., Inc., supra*, 465 F.Supp. at 129.

The evidence establishes that, as between plaintiff and defendant Balsamo, the only party to have made commercial use of the name "Vito" is plaintiff, who conceived of incorporating that name into "Vito and the Salutations," and who originally appropriated and used the latter name to promote the "doo-wop" group under his management. Because Balsamo never made independent commercial use of the name "Vito," the Court is at a loss to perceive what trademark rights defendant had acquired in that name that he could properly have "assigned" to plaintiff. Moreover, Balsamo's testimony at trial demonstrates that he consented to the addition of the name "Vito" to "The Salutations" when Rick originally proposed that change in 1961. Nothing in the evidence adduced at the preliminary injunction hearing or at trial indicates that Balsamo ever objected to the use of "Vito and the Salutations" to identify the musical group, either during his tenure as lead singer or at his departure from the group in 1974. Thus, even if Balsamo were considered to have possessed trademark rights in the name "Vito," his express consent in 1961 to the inclusion of the name in "Vito and the Salutations," coupled with his acquiescence in the continued use of the latter name even after he ceased performing in Rick's group in 1974, would preclude Balsamo from now challenging plaintiff's use of the name. *Cf. Von Faber-Castell v. Faber*, 139 F. 257, 259 (2d Cir.), *cert. denied*, 199 U.S. 609, 26 S.Ct. 750, 50 L.Ed. 331 (1905)

(plaintiff's acquiescence in defendant's use of "E. Faber" as trade name supported finding that defendant had not breached contract with plaintiff governing use of name in connection with sale of lead pencils); *see also* 3 Callmann § 19.60.

The Court therefore concludes that plaintiff was not obligated to obtain a formal "assignment" of defendant Balsamo's name in order to make valid use of the mark "VITO AND THE SALUTATIONS" in commerce. However, this does not automatically dispose of defendants' secondary contention, that Balsamo's name is, in any event, unassignable. Underlying defendants' secondary argument is the general proposition that a trade name or mark that has become identified with the skill or reputation of a particular individual cannot be separated from that individual's personality. 3 Callmann § 19.60. Frequently, the personal reputation upon which the trade name or mark draws is that of the owner of a particular business. However, the mark at issue may also be associated with an employee or other individual whose skill or reputation has become linked with the product or service. *See, e.g., Lowell Lamb & Co., Inc. v. Herskovits*, 204 App.Div. 407, 198 N.Y.S. 55 (1st Dep't 1923), *appeal dismissed*, 238 N.Y. 572, 144 N.E. 897 (1924) (trademark associated with personal skill of plaintiff, a fur grader and sorter in employ of defendants). Regardless of the individual's relationship to the business, it is acknowledged that, under such circumstances, "[t]he owner of the business cannot continue his use of the mark after the termination of the relationship." 3 Callmann § 19.44. Otherwise, the owner's continued use of the mark could mislead the public into assuming that the individual was still affiliated with the business. *Id.*

In a recent decision involving the forced sale of plaintiff's service mark to a judgment creditor, the Second Circuit observed that "[e]ntertainment services are unique to the performers." *Marshak v. Green*, 746 F.2d 927, 930 (2d Cir.1984). Applying this statement to the instant case, defendants argue that plaintiff cannot claim own-

ership of the mark "VITO AND THE SALUTATIONS" because the public identifies that mark with the performers themselves, and chiefly with Vito Balsamo. In line with the analysis set forth above, defendants appear to be arguing that, even if Balsamo consented to and subsequently acquiesced in plaintiff's use of the mark "VITO AND THE SALUTATIONS," the public nevertheless has come to identify the mark with Balsamo as the "doo-wop" group's lead singer. Therefore, under this analysis, any right plaintiff had acquired to use the mark expired with Balsamo's departure in 1974. Plaintiff's continued promotion of the group as "Vito and the Salutations" after 1974, defendants' argument suggests, has misled the public into assuming that defendant Balsamo is still performing in the group. Unfortunately for Balsamo and the other defendants, the record does not support such a reading of the facts in the instant case.

As previously stated, defendants shoulder the burden of *disproving* plaintiff's ownership of the registered service mark at issue. With respect to the foregoing argument, however, defendants simply have not persuaded the Court that the mark "VITO AND THE SALUTATIONS" is inextricably linked in the public's eye with the personal skill or reputation of Vito Balsamo. In the first place, the mark does not identify a particular individual named Vito Balsamo, but rather identifies a musical group, one of whose members may be named or nicknamed "Vito." Although the record establishes that Balsamo sang the tenor lead in the musical group from 1961 to 1974, defendants have not demonstrated that Balsamo developed any particular notoriety during his tenure in that role. In contrast to performers in more successful musical groups of the 1960s and early 1970s, there is no evidence that Balsamo or any other members of the group received particular media attention, either through exposure on radio or television, through publications in the popular music field, or

in teen fan magazines. Unlike lead singers in such musical groups as Herman's Hermits, the Supremes, the Rolling Stones and—more recently—the Talking Heads,[12] the record provides no indication that Vito Balsamo ever developed a "following" either while performing with "Vito and the Salutations" or after leaving the group in 1974. The Court therefore does not perceive a basis upon which Balsamo can argue that the mark "VITO AND THE SALUTATIONS"—either on its face or as used in commerce since 1961—is identified by the public with the personal skill or reputation of Vito Balsamo.

At trial, the Court received testimony from Norm N. Knight, a disc jockey on a New York radio station and self-proclaimed "expert" on popular music. Knight testified that a distinctive feature of "doo-wop" groups such as "Vito and the Salutations" is the lead singer's sound, and that the public would therefore associate the group with the lead singer. Thus, Knight opined, the public would not accept a group performing under the name "Vito and the Salutations" that did not include Vito Balsamo, the group's original lead singer.

Leaving aside the witness's general propositions about typical audience reaction to musical groups that perform in the "doo-wop" style, it is apparent that Knight's statements regarding "Vito and the Salutations" are not supported by the facts of this case. First, it has been established through the testimony of several former members of the group that even during the period when defendant Balsamo was performing with "Vito and the Salutations," other individuals sang the tenor lead on occasion, either because Balsamo was ill or otherwise unavailable for a live performance. Moreover, when Balsamo left the group in 1974, plaintiff continued to be able to book singing engagements for the group despite Balsamo's absence from the ensemble. The record therefore does not support Knight's assertion that "Vito and the Salu-

---

**12.** The lead singers referred to are, respectively, Peter Noone, Diana Ross, Mick Jagger and David Byrne.

tations," without Vito Balsamo, would have been unacceptable to the listening public. Both during Balsamo's tenure and after his departure in 1974, other singers performed the role of "Vito." Nothing in the record suggests that Balsamo's absence from the group caused "Vito and the Salutations" to fall into disfavor with its audience.

Indeed, Knight's own definition of the "doo-wop" sound—as "barbershop with a beat"—casts doubt upon his assumption that "Vito and the Salutations" could not succeed without Vito Balsamo singing the tenor lead. As the Court understands Knight's definition of "doo-wop," the term implies close, *a cappella* harmony, most likely performed by four or more male voices.[13] In such a barbershop-type group, the tenor part would naturally "stand out," both because of its relatively higher pitch and because, more often than not, it would be the part carrying the melody. Nevertheless, because of the close harmony and lack of musical accompaniment, it would be important for the tenor's voice to blend with the others in order to achieve a musical result. The Court therefore considers it less likely that Vito Balsamo would have lent a distinctive sound to "Vito and the Salutations"—a group that has performed exclusively in the barbershop-like style of "doo-wop"—than if he had held the position of lead singer in a less musically integrated vocal group.

To recapitulate, the Court is persuaded neither by defendants' characterization of the working relationship between plaintiff and the performing members of "Vito and the Salutations," nor by defendants' arguments concerning the purported identification of the service mark at issue with the singing ability or personality of Vito Balsamo. Having failed under either of the above theories to prove that plaintiff is *not*

the owner of the registered service mark at issue, defendants must fall back upon their remaining defenses of invalid registration, abandonment, laches and unclean hands. The Court considers these defenses to be of dubious merit, but addresses each below.

2. Invalidity of the Registered Service Mark

Defendants raise several challenges to the validity of plaintiff's registration of the service mark "VITO AND THE SALUTATIONS" with the U.S. Patent Office. Based upon such challenges, defendants urge the Court to cancel the registration pursuant to its inherent powers under 15 U.S.C. § 1119.[14] As has already been indicated, plaintiff's federal registration of the mark constitutes *prima facie* evidence of its validity, and shifts to defendants the burden of persuasion on the validity issue. *See Cartier, Inc. v. Three Sheaves Co., Inc., supra,* 465 F.Supp. at 127–28. Viewing defendants' challenges to the validity of the registration both separately and together, the Court concludes that defendants have not met their burden of proof.

Defendants argue, first, that plaintiff's service mark registration should be cancelled because it was fraudulently obtained. Specifically, defendants contend that on the application for the mark, plaintiff misstated the date on which he had first used the mark in commerce. At trial, plaintiff acknowledged—as he had previously at the evidentiary hearing held in 1982—that he had erred in stating on the trademark application that the first use of the mark in commerce had occurred in March of 1963. In fact, Rick testified, he had first used the mark in commerce in March or April of 1962.

█ As the Court observed in rendering its decision on plaintiff's preliminary in-

---

**13.** "Barbershop" has been defined as a "style of impromptu unaccompanied vocal harmonizing of popular songs esp[ecially] by a male quartet or any informal singing group" and is "marked by avoidance of spread chords and by the favoring of chromatically altered tones." *Webster's Third New Int'l Dictionary* 175 (1981 ed.).

**14.** The statute provides in relevant part:

In any action involving a registered mark the court may determine the right to registration, order the cancelation [sic] of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.

junction motion, misstatements in a registration application provide a basis for cancelling the registration only if the misstatements (1) were made with *knowledge* of their falsity, and (2) were *material* to the determination to grant the application. *Five Platters, Inc. v. Purdie,* 419 F.Supp. 372, 384 (D.Md.1976). In contrast, "[s]tatements of honest, but perhaps incorrect, belief or innocently inaccurate statements of fact are insufficient[,] as are knowing misstatements which would have a *de minimis* effect on the validity of the service mark." *Id.*

In the instant case, plaintiff's testimony, both at the evidentiary hearing and at trial, demonstrates that the erroneous date he supplied on his service mark application was made innocently, not fraudulently. Moreover, there is no indication in the record that this misstatement was in any way material to the decision that plaintiff's application should be granted. This admitted error on plaintiff's application for service mark registration therefore does not provide a basis upon which to cancel that registration.

Defendants' second argument for invalidating plaintiff's service mark registration is that plaintiff is not entitled to register the service mark "VITO AND THE SALUTATIONS" under his name because the mark identifies the entertainment services of Vito Balsamo and other performers in the musical group, not plaintiff. Defendants refer the Court to § 45 of the Lanham Act, as amended, 15 U.S.C. § 1127, wherein "service mark" is defined as "a mark used in the sale or advertising of services to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." Defendants further point to materials submitted by plaintiff to the U.S. Patent Office in support of his application for service mark registration. The materials include, *inter alia,* a promotional photograph of the musical group taken sometime in its early years, assorted newspaper clippings advertising live appearances by the group, and a booking engagement contract for the group dated May 9, 1968. These specimens, defendants argue, demonstrate that the service mark plaintiff succeeded in registering identifies the services of the performers in the musical group, and not plaintiff, the group's manager.

The above argument has been addressed in part by the Court in the previous discussion of plaintiff's ownership of the mark. As the Court observed above, the service mark at issue does not refer to a particular individual named Vito Balsamo, but rather, identifies a musical group, one of whose members apparently is named (or nicknamed) "Vito." Similarly, the materials submitted with plaintiff's trademark application make no mention of Vito Balsamo, but refer instead to "Vito and the Salutations," and to their manager, Dave Rick. Finally, as the evidence has already established, the composition of the musical group at issue here has changed constantly over the years, beginning with the departure of three of the original members less than a year after the group's formation. Therefore, the Court rejects defendants' contention that the mark "VITO AND THE SALUTATIONS" identifies the entertainment services of Vito Balsamo or any other particular individuals who have performed in the group since its inception in 1961.

There remains, however, the issue of whether plaintiff, the manager and promoter of a musical group, can properly register a mark identifying the entertainment services of that group, although he himself is not one of the performers. It is well established that "[a] trademark need not be the name of the manufacturer of the goods and the public need not know the name of the owner of the mark." *In re Polar Music Int'l AB,* 714 F.2d 1567, 1571 (Fed.Cir.1983) (citing *Coca-Cola Co. v. Koke Co. of Amer.,* 254 U.S. 143, 146, 41 S.Ct. 113, 114, 65 L.Ed. 189 (1920)). A trade or service mark functions in part to inform the public of the source of the product or service to which the mark attaches, and to assure the public of its quality. Therefore, to the extent an individual con-

trols the quality of the good or service involved, he or she may properly register a mark for that good or service. *Id.; accord,* 4A Callmann § 25.27. Because "[t]he source of the goods does not depend on the public's perception [,] the public need not know [the registrant's] role." *In re Polar Music Int'l AB., supra,* 714 F.2d at 1571.

■ In the instant case, the Court has already determined that plaintiff may properly claim ownership of the service mark "VITO AND THE SALUTATIONS" because it was Rick who originally appropriated and used the mark in commerce. Indeed, the Court found above that plaintiff is the only individual who has used the mark continuously since he first conceived of the name "Vito and the Salutations" in late 1961. As the manager of the musical group, plaintiff has steadily promoted its name through his solicitation of bookings and through general advertising. Moreover, plaintiff's duties over the years have included making personnel decisions, handling the group's finances, and generally supervising the style and content of the group's "act." In contrast, three of the group's four original performing members remained for less than a year; the fourth, defendant Balsamo, left the group permanently in 1974. While the record reflects that many of the group's former members have returned to sing with the group from time to time, none has performed with the group continuously since 1961, nor does the evidence suggest that any performer has ever supplanted plaintiff as overseer of the group's day-to-day operations.

Particularly in view of the constant turnover of performers within the musical group, the Court concludes that only plaintiff has been in a position to control the content and quality of the entertainment services provided by "Vito and the Salutations" over the last twenty-three years. Thus, plaintiff could properly register a mark identifying the entertainment services of the group, even though his name is not a part of the mark and he himself has never performed in the musical group. *Cf.*

*In re Polar Music Int'l AB., supra,* 714 F.2d at 1571 (Swedish corporation properly applied for trademark identifying sound recordings of musical group "ABBA," where it was only entity entitled to control quality of such recordings); *cf. also* 4A Callmann § 25.27 (whoever controls content, nature or quality of radio or television show may properly register service mark identifying the show). Defendants' argument, that plaintiff's registration is invalid because the mark at issue does not identify his services, therefore must fail.

Finally, defendants argue that plaintiff's registration of the service mark "VITO AND THE SALUTATIONS" is invalid because plaintiff did not obtain the written permission of defendant Balsamo to use his given name, "Vito," as part of the registered mark. Defendants rely upon § 2 of the Lanham Act, 15 U.S.C. § 1052, which provides in relevant part:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—
>
> . . . . .
>
> (c) Consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent. . . .

Plaintiff acknowledged at trial that he had not sought—and has not received—Balsamo's written consent to use the name "Vito" in the service mark he ultimately registered with the U.S. Patent Office.

Defendants' final contention merits little discussion. The statute section to which defendants refer the Court explicitly provides that written consent must be obtained in order to register a mark that consists of or comprises a name "identifying a *particular living individual.*" 15 U.S.C. § 1052(c) (emphasis added). As the Court has already determined, the service mark "VITO AND THE SALUTATIONS" does not identify Vito Balsamo, either on its face or by virtue of the secondary meaning it has acquired over the last twenty-three years. For the reasons previously

discussed, the Court remains unconvinced that the public identifies the "Vito" in "Vito and the Salutations" with defendant Balsamo. Moreover, there is no evidence in the record that Balsamo himself has ever used the name "Vito" professionally. Defendants therefore do not persuade the Court that plaintiff was obliged to obtain Balsamo's written consent pursuant to 15 U.S.C. § 1052(c) in order to register "VITO AND THE SALUTATIONS" as a service mark.

What little case law exists on the "written consent" requirement of 15 U.S.C. § 1052(c) supports the Court's determination. The purpose underlying the statutory requirement is "to protect one who, for valid reasons, could expect to suffer damage from another's trademark use of his name." *Martin v. Carter Hawley Hale Stores, Inc.*, 206 U.S.P.Q. (BNA) 931, 933 (Trademark Tr. & App.Bd.1979). Thus, to prevail in an action seeking cancellation of a mark under 15 U.S.C. § 1052(c), an individual must prove not only that the mark at issue identifies him or her in the eyes of the public, but that he or she has been damaged by such an association. *See id.*

Even in cases in which an individual has challenged the registration of a mark that comprised both his given name and his surname, the reviewing body has not found invalidation of the mark to be warranted because the individual could not prove damage. *See, e.g., Martin v. Carter Hawley Hale Stores, Inc., supra,* 206 U.S.P.Q. at 931 (Neil F. Martin unsuccessfully opposed registration of mark "NEIL MARTIN" for men's shirts); *Brand v. Fairchester Packing Co.,* 84 U.S.P.Q. (BNA) 97 (Comm'r of Patents 1950) (Arnold Brand unsuccessfully sought cancellation of mark identifying "ARNOLD BRAND" fresh tomatoes). In one case involving a registered mark that comprised only the surname of an individual, "Fanta," the Trademark Trial and Appeal Board rejected the individual's challenge under 15 U.S.C. § 1052(c), in part because the name clearly was the "surname of persons other than petitioner, and, in view thereof, it manifestly does not and

cannot per se identify any 'particular living individual.'" *Fanta v. Coca-Cola Co.,* 140 U.S.P.Q. (BNA) 674, 675 (Trademark Tr. & App.Bd.1964).

In the instant case, the service mark at issue does not comprise a particular individual's given and surname, nor even an individual's surname, but only a given name. Defendant Balsamo surely does not claim to be the only "Vito" residing in the New York area; he was, doubtless, not the only "Vito" growing up in his neighborhood of Brooklyn during the 1950s. Balsamo therefore is hard-pressed to argue that the "Vito" in "VITO AND THE SALUTATIONS" identifies a "particular living individual" within the meaning of 15 U.S.C. § 1052(c). Moreover, in view of his own testimony that he had consented in late 1961 to the use of "Vito" as part of the "doo-wop" group's name, and in view of his acquiescence in the continued use of the name even after he left the group in 1974, Balsamo must be estopped from arguing now that the "expect[s] to suffer damage from [plaintiff's] trademark use of his [given] name." *Martin v. Carter Hawley Hale Stores, Inc., supra,* 206 U.S.P.Q. at 933. Thus, defendants' challenge to the service mark registration under 15 U.S.C. § 1052(c), like their previous challenges to the validity of plaintiff's registration, is meritless and must be dismissed.

### 3. Abandonment

Defendants argue that, even if plaintiff has acquired ownership rights in the service mark at issue, he abandoned those rights by substantially changing the nature and quality of the entertainment services identified with the mark. Defendants' Proposed Findings at 26. The factual basis of this defense is not clear. Defendants appear to ground their abandonment argument in the fact that, on different occasions during the past several years, plaintiff has invited a female and a black male vocalist to perform with "Vito and the Salutations." Defendants suggest that because the musical group was composed originally of white males, the appearance of a female or black performer with the

group evidences plaintiff's abandonment of the service mark. Defendants' argument must be rejected.

 The federal standard for determining abandonment in trademark cases is set forth in § 45 of the Lanham Act, as amended. The relevant statute section provides:

A mark shall be deemed to be "abandoned"—

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin. Purchaser motivation shall not be a test for determining abandonment under this subparagraph.

15 U.S.C. § 1127. Thus, to demonstrate plaintiff's abandonment of the service mark at issue in the instant case, defendants must prove not only plaintiff's *nonuse* of the mark, but also his *intent* not to resume use. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980). The intent to abandon a registered mark may be proven by establishing that the conduct of the registrant has caused a loss in significance of the mark as an indication of origin. *See* 15 U.S.C. § 1127; *Guiding Eyes for Blind, Inc. v. Guide Dog Foundation for Blind, Inc.*, 384 F.2d 1016, 1019 (Ct.Cust. & Pat.App. 1967). However, a showing that the registrant has vigorously opposed efforts to infringe upon the mark will defeat a claim of abandonment under 15 U.S.C. § 1127. *See A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 693 (2d Cir.1972).

Defendants, who carry the burden of proof on their abandonment defense, *see Guiding Eyes for Blind, Inc., supra*, 384 F.2d at 1017, have demonstrated neither plaintiff's non-use of the service mark at issue nor plaintiff's intent to abandon the mark. Rather, the evidence establishes that plaintiff has made continuous use of

the mark in commerce since early 1962 through his management and promotion of "Vito and the Salutations." Moreover, plaintiff has vigorously litigated his claim of ownership rights in the service mark, both in the state court lawsuit he commenced in 1981 against many of the defendants named in the instant action, and in the consolidated federal lawsuits now before this Court. Plaintiff's tenacity in pursuing both his state and federal court remedies against defendants' alleged infringement of his registered service mark plainly disproves any claim that he has abandoned the mark. *See A.T. Cross Co., supra*, 470 F.2d at 693.

 Defendants argue, nonetheless, that abandonment may be inferred from changes plaintiff has wrought in the composition of "Vito and the Salutations." This contention is without merit. Because abandonment for federal trademark purposes requires proof of intent not to use a particular mark, it has been suggested that a mere change in the quality or nature of the trademarked product should not imply abandonment. *See* 3 Callmann § 19.65. Indeed, the "changes" with which defendants appear concerned in the instant case do not establish plaintiff's abandonment of the service mark at issue.

Testimony adduced at the evidentiary hearing and at trial establish that, when defendants Buchansky, Pardocchi, Spinelli and Graziano left plaintiff in 1980 and entered into a management agreement with defendant Garone, plaintiff was forced to recruit and train an entirely new ensemble of performers. Among those invited by Rick to sing with the group was Cathy Ercolano, the wife of Mike Ercolano, a former "Salutation" who also returned to sing with the group at that time. The record also reflects that plaintiff has on occasion invited Doc Green, a former member of "The Drifters," an all-black vocal group, to appear in live performances with "Vito and the Salutations." However, the record makes clear that the membership of the musical group involved here has changed constantly over the past twenty-three

years. What continuity in performance the group has retained over the years must be attributed to the managerial efforts of plaintiff. In view of the historical turnover of performers within this musical group, the Court is unpersuaded that the occasional appearance of a female vocalist with the group, or the "guest appearance" of a black vocalist formerly associated with another musical group, has "cause[d] the mark to lose its significance as an indication of origin." 15 U.S.C. § 1127. If there has been some dilution over the years of plaintiff's service mark as an indicator of a particular form of entertainment service, it is the result, not of plaintiff's conduct, but of the conduct of the many singers who have performed briefly with the group and then departed, requiring new members to be recruited and trained to replace them. Plaintiff's doggedness in managing and promoting the group through periods of rapid turnover in personnel evidences intent to retain, not abandon, the service mark at issue.

### 4. Laches and Unclean Hands

■ Defendants contend, finally, that plaintiff is precluded from obtaining the injunctive relief he seeks by the equitable doctrines of laches and unclean hands. Neither equitable defense aids defendants here.

The Second Circuit standard for establishing laches as a defense in a trademark suit for permanent injunctive relief is that set forth by the circuit court in *Saratoga Vichy Spring Co., Inc. v. Lehman, supra*, 625 F.2d at 1040. In that case, the circuit approved the standard applied by Judge Weinfeld in *Cuban Cigar Brands, N.V. v. Upmann Int'l, Inc.*, 457 F.Supp. 1090 (S.D. N.Y.1978), *aff'd*, 607 F.2d 995 (2d Cir.1979): "Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequit-

ably to assert its rights at this time." *Saratoga Vichy Spring Co., supra*, 625 F.2d at 1040 (quoting *Cuban Cigar Brands, N.V., supra*, 457 F.Supp. at 1096).[15]

In ruling on plaintiff's motion for a preliminary injunction in 1982, this Court held that defendants had not proven any "inexcusable delay" on plaintiff's part before taking action to enforce his rights in the service mark at issue, and further, that defendants had not proven any prejudice that would make it inequitable for plaintiff to assert his rights in the service mark at this time. Defendants continue to plead the defense of laches, but offer no additional evidence, either of delay or of prejudice, to sway the Court from its initial rejection of their argument. The Court therefore adheres to its original determination that the defense of laches is inapplicable to the facts of this case.

The evidence establishes that when, in the fall of 1980, plaintiff learned that defendants Buchansky, Pardocchi, Spinelli and Graziano had entered into a management agreement with defendant Garone, he immediately notified those defendants that he considered them to be in breach of his management agreement with them, and further, that their use of the name "Vito and the Salutations" infringed his rights in the name. This initial notification was followed by repeated communications to the performing defendants and to defendant Garone, and ultimately by plaintiff's filing of a lawsuit against most of the present defendants in state court. In contrast to the plaintiff in *Saratoga Vichy*, who acquiesced in New York State's purportedly infringing conduct for a period of seven years, plaintiff here took prompt action to notify defendants of what he considered to be their infringement of his trademark rights. In *Saratoga Vichy*, the Second Circuit observed that "[a] simple warning letter would have sufficed." 625 F.2d at 1041. In the instant case, plaintiff apprised defendants of his infringement

---

**15.** *Cf. Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985) (significant delay in seeking injunctive relief in trademark case may, in it-

self, neutralize presumption of irreparable harm flowing from alleged infringement, thereby precluding grant of *preliminary* injunctive relief).

claim, not once but several times. Plaintiff's repeated warnings were followed ultimately by his filing suit against defendants in state court. Under the standard approved in *Saratoga Vichy*, then, defendants have not proven inexcusable delay on plaintiff's part before taking action with respect to his rights in the service mark at issue.

Nor have defendants demonstrated that they have been prejudiced by plaintiff's conduct with respect to the trademark rights asserted here. The defendants in *Saratoga Vichy* were found by the circuit court to have acted innocently and in reliance upon the plaintiff's acquiescence in their use of the trademark involved in that case. In contrast, defendants Buchansky, Pardocchi, Graziano and Spinelli consciously severed their ties with plaintiff and, under defendant Garone's management, established a rival "doo-wop" group performing with the identical name as plaintiff's group. Even after receiving repeated warnings from plaintiff that he considered the rival group to be infringing his rights in the name "Vito and the Salutations," Garone's group continued to advertise and book concert appearances under that name. Nor can defendant Balsamo make any stronger showing of prejudice. He was not a party to the management contract the other performing defendants had signed with plaintiff in 1980, and therefore Balsamo cannot be charged with consciously defecting from plaintiff's group to establish a rival group of his own. However, when Balsamo joined Garone's rival group in late 1980, he emerged from a six-year period of disassociation from the group managed by Rick. Along with the rest of the performers in Garone's group, Balsamo was placed on notice by plaintiff that their continued use of the name "Vito and the Salutations" infringed plaintiff's asserted rights in the name. Balsamo's continued appearances with Garone's group, after receiving repeated warnings from plaintiff that his rights were thereby being infringed, precludes Balsamo from asserting that his use of the mark at issue has been "innocent."

Failing to establish a defense of laches on the facts of the instant case, defendants nonetheless urge the Court to deny injunctive relief to plaintiff under the equitable principle of "unclean hands." However, the only conduct that defendants characterize as "unclean" is plaintiff's alleged "deliberate use of the name 'Vito and the Salutations' in false advertising." Defendant's Proposed Findings at 28. As the Court has already determined, plaintiff possesses valid ownership rights in the service mark "VITO AND THE SALUTATIONS." Therefore, plaintiff's use of the mark in commerce to promote the entertainment services of the musical group he manages does not in itself amount to false advertising. Absent other evidence in the record that plaintiff has falsely promoted the "doo-wop" group he manages, defendants' "unclean hands" defense must fail.

### Balancing the Equities

Having determined that the service mark at issue is entitled to federal trademark protection, that plaintiff first appropriated and used the mark in commerce, that defendants' various attacks upon the validity of the mark in plaintiff's hands are unavailing, and that a likelihood of confusion exists between plaintiff's mark and that used by defendants, the Court must now balance the equities to determine the appropriateness of granting plaintiff permanent injunctive relief. To strike the balance of equities, the Court considers the following three interests: that of the senior user, that of the junior user, and that of the public. *Lambda Elecs. Corp. v. Lambda Tech., Inc., supra,* 515 F.Supp. at 924. Of particular relevance to the Court's balancing of the equities in the instant case is the good faith (or bad faith) use of the mark by defendants, the junior users. *See Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir.1964); *C–Cure Chem. Co., Inc. v. Secure Adhesives Corp.,* 571 F.Supp. 808, 818–19 (W.D.N.Y.1983); *Col-*

lectors' Guild, Ltd. v. Numismatic Collectors Guild, Inc., 564 F.Supp. 957, 961 (S.D. N.Y.1983). Also of importance in the fashioning of a suitable injunctive remedy in this case is the corresponding conduct of plaintiff. The Court considers these relevant interests and factors in turn.

The Court's determination that plaintiff is the rightful owner of the registered service mark "VITO AND THE SALUTATIONS," and that a likelihood of confusion exists between the two musical groups now performing under that name, implicates plaintiff's interest in protecting the goodwill he has acquired through use of the mark over the past twenty-three years. Moreover, the Court's finding of a likelihood of confusion brings into play the public's interest in being able to distinguish between competing products or services. Thus, based solely upon the findings that plaintiff's registered service mark is valid and that confusion arising from plaintiff's and defendants' use of the identical mark is likely, the balance of equities tips in the first instance toward granting plaintiff the permanent injunction he seeks.

Other factors, however, must also be considered. Because the instant case involves *competing* entertainment services, certain of the factors often considered by courts in weighing the equities in the trademark infringement context are inapplicable here. One such factor is the likelihood that the senior user will "bridge the gap," which was among those factors listed by Judge Friendly in the landmark decision of *Polaroid Corp. v. Polarad Elecs. Corp., supra,* 287 F.2d at 495. The entertainment services of the two musical groups involved here are, if not virtually identical, then exceedingly similar. There is, therefore, no "gap" for plaintiff to "bridge" between the services identified with his mark and that identified with defendants.

Another factor identified in *Polaroid,* however, is of relevance. That is the good faith of defendants in their use of the service mark at issue. *See* 287 F.2d at 495. Even in an infringement case involving competing goods, the junior user can pre-sumably argue that its use of the mark at issue has been innocent and in good faith, thereby tipping the balance of equities away from a finding of infringement. In the instant case, however, the record reveals that defendants' use of the service mark has been far from innocent.

As the previous discussion of defendants' laches argument should suggest, this is not a case in which the junior user has conceived of a mark and employed it in commerce, unaware that the mark had already been appropriated and used by another. The infringing use upon which plaintiff bases his claim here began in the fall of 1980, after defendants Buchansky, Graziano, Pardocchi and Spinelli had ceased performing under plaintiff's management and had signed a management agreement with defendant Garone. Having previously performed under plaintiff's auspices as "Vito and the Salutations," those four defendants promptly began making concert appearances booked by Garone under that same name. Defendant Balsamo, who joined Garone's group in late 1980, had also performed previously in plaintiff's group under the name "Vito and the Salutations." Thus, none of the performing defendants can claim to have used the name "Vito and the Salutations," in conjunction with their appearances in Garone's group, *without* knowledge that the name was already being employed in commerce to identify the entertainment services of the "doo-wop" group managed by Rick. *Cf. Chandon Champagne Corp. v. San Marino Wine Corp., supra,* 335 F.2d at 534–35 (defendant took name "Pierre Perignon" as trademark for domestic sparkling wine, unaware of plaintiff's prior use of name "Dom Perignon" to identify choice French champagne).

Nor can defendants claim that their continued use of the name "Vito and the Salutations" since late 1980 has been in good-faith reliance upon plaintiff's acquiescence or consent to such use. As the Court's previous discussions of abandonment and laches should make clear, plaintiff's conduct toward defendants since 1980 has

been anything but acquiescent. When he learned that Buchansky, Graziano, Pardocchi and Spinelli had entered into an agreement with Garone and were booking concert appearances under the name "Vito and the Salutations," Rick promptly informed these defendants that he viewed their conduct to be an infringement of his rights in the name. The record establishes that, in the years that followed, plaintiff relentlessly pursued his claims against the defendants, first in state and then in federal court. Indeed, in the period that has elapsed between this Court's issuance of a preliminary injunction and the trial on infringement liability, the Court itself has witnessed plaintiff's zealous—at times overzealous—attempts to curtail concert bookings by Garone's group. In short, defendants' use of the service mark at issue has been with knowledge of plaintiff's prior use of the mark and has continued in the face of plaintiff's repeated and strenuous objections to such use. Defendants therefore have not exhibited good faith in their appropriation and use of the name "Vito and the Salutations," and this factor tips the balance of equities even further toward a finding of infringement.

Based solely upon consideration of the factors outlined in *Polaroid*, the Court concludes that the balance of equities in this case tips in favor of plaintiff, the senior user of the service mark. Normally such a finding would entitle plaintiff to a permanent injunction of the junior user's infringing use. *See, e.g., Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 618 F.2d 950, 955 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982). However, in view of the protracted history of this case, and of the complicated interrelationship of the parties, the Court finds it necessary in addition to consider the general conduct of the parties—including that of plaintiff—before determining what injunctive relief is appropriate.

■■■■ Defendants themselves have raised the defense of plaintiff's "unclean hands," although their defense has been limited to allegations of false advertising that, the Court concluded above, are not supported by the record. Nonetheless, it is a principle of general application that a court sitting in equity may properly withhold its aid where the plaintiff is using the right asserted in a manner that is contrary to the public interest. *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363 (1942). In the context of a trademark infringement action, such opprobrious conduct would include, for example, misrepresentations made by the plaintiff itself as to the nature of the trademarked product or service. *Id.* at 494, 62 S.Ct. at 406; *see, e.g., Haagen-Dazs, Inc. v. Frusen Gladje Ltd., A.B.*, 493 F.Supp. 73, 75–76 (S.D.N.Y.1980). The Court must make certain that, if injunctive relief is to be granted to plaintiff as senior user of the service mark, that the decree does not permit plaintiff himself to mislead the public as to the nature of the services identified with his registered mark.

It is beyond peradventure that "[e]quity does not adjust the differences between rogues." *Fay v. Lambourne*, 124 App.Div. 245, 247, 108 N.Y.S. 874, 876 (1st Dep't 1908), *aff'd*, 196 N.Y. 575, 90 N.E. 1158 (1909). On the other hand, " 'equity does not demand that its suitors shall have led blameless lives.' " *Morton Salt Co. v. G.S. Suppiger Co., supra*, 314 U.S. at 493, 62 S.Ct. at 405 (quoting *Loughran v. Loughran*, 292 U.S. 216, 229, 54 S.Ct. 684, 689, 78 L.Ed. 1219 (1934)). While the Court would not go so far as to characterize one or more parties to the instant case as a "rogue," it is clear that—at least with respect to the litigation at hand—certain of the parties have not led "blameless lives." No doubt in part because of the circumstances under which plaintiff and certain of the defendants ceased doing business together in late 1980, the proceedings in the instant lawsuit have been fraught with acrimony and vituperation. Accusations of misconduct, often lacking in credible evidentiary support, have been flung by both sides at the other. Most troubling to the Court is the degree to which certain of the parties, including plaintiff, have attempted to serve their own interest by offering testimony and docu-

mentation into evidence that the Court simply cannot accept as credible or authentic.[16]

While plaintiff's conduct, and the conduct of other parties to these proceedings, has not been so offensive to the Court as to preclude granting equitable relief of any sort, the Court is concerned that the terms of the permanent injunction, to which plaintiff normally would be entitled as senior user of the service mark, not inflict any additional confusion upon the public. In the context of this case, a likely area of future confusion concerns the membership of both plaintiff's and defendant Garone's respective musical groups. Because neither group at present contains all four original members of "Vito and the Salutations," it would, for example, be patently misleading for either group, under any name, to advertise itself as the original foursome that recorded "Gloria" and "Unchained Melody." Similarly, it would be misleading to use, in connection with advertising live performances or recordings of either group, photographs that depict anyone not a member of that group at the present time. Thus, the permanent injunction that issues in this case must, by its terms, enjoin the parties, not solely with respect to their use of the mark "VITO AND THE SALUTATIONS," but with respect to the manner in which any of the parties makes use of the goodwill associated with that name.

### Plaintiff's State Claims

■ As noted earlier, the complaint raises several state law claims in addition to the federal claim of trademark infringement. *See supra* note 2. Of relevance here are plaintiff's statutory claim of trademark dilution under N.Y.Gen.Bus.Law

§ 368–d and common-law claim of unfair competition. Adjudication of these claims is made relatively easy by virtue of the Court's finding of a likelihood of confusion with respect to plaintiff's federal infringement claim. Statutory trademark dilution and common-law unfair competition are both made out by a showing of a likelihood of confusion and a balance of equities favoring the senior user, such as the Court has found to exist here. *Berlitz Schools of Languages of America, Inc. v. Everest House*, 619 F.2d 211, 215 (2d Cir.1980); *Lambda Elecs. Corp. v. Lambda Tech., Inc., supra*, 515 F.Supp. at 930. Accordingly, the Court concludes that, in addition to prevailing on his claim of federal trademark infringement, plaintiff has proven both defendants' violation of N.Y.Gen. Bus.Law § 368–d and unfair competition. Because the parties did not fully address plaintiff's remaining state law claims at trial, and submitted no proposed findings of fact or law with respect to those claims, the Court reserves decision as to such claims pending receipt of additional evidence at the ensuing trial on damages.

### CONCLUSION

■ Plaintiff has sustained his burden of proving violations of 15 U.S.C. § 1114(1) and N.Y.Gen.Bus.Law § 368–d, as well as common-law principles of unfair competition. Therefore, plaintiff is entitled to a decree requiring defendants to discontinue their use of plaintiff's federally registered service mark "VITO AND THE SALUTATIONS," or any word or words of like import, or any colorable imitation of that service mark, in connection with the promotion, exploitation, sale or offering for

---

**16.** The Court has alluded earlier in this opinion to the patently self-serving testimony elicited from the parties at the recent trial. In plaintiff's case, the testimony he offered at trial was plainly inconsistent in several respects with testimony contained in affidavits that he had submitted previously to the Court. In addition, plaintiff attempted to offer into evidence a document concerning which the Court had serious doubts as to authenticity. The document, a copy of a form contract signed by seven individuals in August of 1963, contained an additional typed paragraph that three of the signatories testified was not on the original document they had signed in 1963. The paragraph in question concerned the performers' rights (or more accurately, lack of rights) to use the name "Vito and the Salutations" in the event one or more of them left Rick's group. This document was not admitted into evidence.

sale of live or recorded singing performances. Such enjoined use should include but not be limited to radio, television and newspaper advertising, and representations—both oral and in writing—to the media, restaurants, supper clubs, booking and theatrical agents and others.

In addition, all parties should be enjoined from misrepresenting, in connection with the promotion, advertising or sale of live or recorded singing performances by a musical group, the identities of the individuals performing in that group. Such injunction should be limited, however, to musical groups composed of one or more individuals who have performed or are performing under the name "Vito and the Salutations." The injunction should include but not be limited to radio, television and newspaper advertising, as well as oral or written representations made to media, restaurants, supper clubs, booking and theatrical agents. Said injunction should extend not only to representations made orally and in writing, but to photographs and other pictorial representations.

In view of the Court's determination that plaintiff is the owner of the registered service mark "VITO AND THE SALUTATIONS," and is entitled to exclusive use of the mark in commerce, defendants' counterclaims are dismissed. The Court's determination with respect to plaintiff's remaining state law claims is reserved pending receipt of additional evidence at the forthcoming trial on damages.

Settle permanent injunction on notice.